IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

IVONNE MONFORT RODRIGUEZ.
ET AL. ,

Plaintiff,

v.

CESAR REY HERNANDEZ, ET AL.,

Defendants.

CIVIL NO. 01-1276 (JAG)

## REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiffs Ivonne Monfort Rodríguez, Juanita Flores de Siaca, Carmen Rivera Rivera and María Coss Martínez (hereinafter "plaintiffs or plaintiff Monfort-Rodríguez, Flores-De Siaca, Rivera-Rivera and/or Coss-Martínez," respectively) filed this civil rights complaint against defendants César Rey Hernández, in his personal capacity, and Dr. Rafael Aragunde, in his official capacity, as Secretary of the Department of Education of the Commonwealth of Puerto Rico (hereinafter "defendants or defendant Rey and/or Aragunde", respectively).  (Docket No. 1).  Plaintiffs were public employees formerly holding trust positions at the Department of Education, who were removed from their trust positions and reassigned to their previous career/permanent posts upon the change in the government administration as a result of the general elections held in Puerto Rico in the year 2000.

On June 30, 2008, defendants Rey and Aragunde filed a Motion for Summary Judgment on several grounds, to wit: plaintiffs had not established a *prima facie* case of

political discrimination; they were entitled to be protected by the changeover defense; plaintiffs' trust positions required political affiliation as an appropriate criteria; and co-defendant Rey should be entitled to qualified immunity. (Docket No. 137).

On September 9, 2008, plaintiffs filed their opposition, after several extensions of time were granted by the Court. (Docket No. 154). On September 10, 2008, these motions were referred to this Magistrate Judge for report and recommendation. (Docket Nos. 158, 161). Thereafter, on October 1, 2008, the corresponding translations of documents into the English language were filed. (Docket Nos. 168, 169). Plaintiffs and defendants were thereafter allowed to file reply and sur-reply. (Docket Nos. 167, 171).

## BACKGROUND

On March 7, 2001, the instant civil rights complaint on grounds of political discrimination in public employment was initially filed. Title 42, United States Code, Section 1983. It included causes of action under state laws for violation of the Personnel Law of the Commonwealth of Puerto Rico and for damages under Article 1802. 31 L.P.R.A. §5141. Plaintiffs claim they were removed from their trust positions at the Department of Education and reinstated to their previously held career positions in violation of their constitutional rights and without due process.

The initial motion for summary judgment filed on October 4, 2002 for lack of *prima facie* case of political discrimination and other defenses was granted by the Court and the case was then dismissed. On direct appeal, the Court of Appeals for the First Circuit vacated the opinion and order and remanded the case for further proceedings on October 17, 2007. (No. 06-1624). The Court of Appeals determined, although the record was then considered

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 3

meager, that plaintiffs had met their burden to generate a genuine issue of material facts

on the elements of their claim.[1]  The appeal decision noted that, in the absence of job

descriptions necessary to evaluate these positions upon which political affiliation would be

an appropriate criterion, such particular argument had not been pursued on appeal.  It was

also indicated that, although a changeover defense may ultimately prevail in the case, the

record on appeal still revealed adequate circumstantial basis to conclude that defendants

were aware of plaintiffs' political allegiance to the opposing political party of the defendants

and these plaintiffs were replaced by loyalist of the incumbent party after the general

elections.  Furthermore, it was also indicated the record lacked evidence of a considered

appraisal of jobs and responsibilities that could substantiate a changeover defense.

It was also noted that, at the time the changes in plaintiffs' positions were made,

defendants acknowledged they knew neither what plaintiffs' duties were nor how well they

had performed their jobs.[2]  The Appeals Court stated it took no view on the propriety of

summary judgment on a more fully developed record.

Defendants have recently filed another motion for summary disposition submitting

plaintiffs had no property right to their trust positions, for which no due process claims are

---

[1]  A previous judgment issued by the Court of Appeals for the First Circuit had returned this case to the district level on an appeal to denial of motion to alter or amend judgment and reconsideration. See Dr. Ivonne Monfort-Rodríguez et al., v. Cesar A. Rey Hernández, et al., No. 04-1233, slip op.  (1st Cir.  December 6, 2004).

[2]         Both Rey and Pillich acknowledged that, at the time the changes were made, they knew neither what plaintiffs' duties were nor how well they had performed their jobs. FN 14. (citations omitted) ... The quick terminations, with no attention to either job functions or performances, are strongly suggestive of pure political motivation... The absence of evidence of a comprehensive or carefully studied effort at reform distinguishes this case from a number of other cases in which we have rejected claims of political discrimination following a change in administration.  See Dr. Ivonne Monfort-Rodríguez, et al. v. Cesar A. Rey-Hernández, et al., No. 06-1624, slip op. pp. 13-14 (1st Cir. October 18, 2007).

appropriate.  Thus, defendants would be entitled to judgment as a matter of law on said issue of due process.  Defendants now raise political affiliation is an appropriate criteria for the trust positions previously held by plaintiffs and these plaintiffs have not made out a claim for political discrimination based on actions less than dismissal.  Co-defendant Rey submits he should be entitled to qualified immunity since no reasonable government official in his position, as then Secretary of Education, would have believed that returning plaintiffs from their trust positions to their career positions would be a violation of their constitutional rights.

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law."  *See* Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).  After the moving party has satisfied this burden, the onus shifts to the resisting party to show there still exists "a trial worthy issue as to some material fact."  *See* Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir.  1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit.  *Id.*  Moreover, there will only be a "genuine" or "trial worthy" issue as to such a

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 5

"material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Id.*

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. Puerto Rico Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *See* Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

When a motion for summary judgment remains unopposed, the district court may grant summary judgment, if appropriate. Still, a district court may not automatically grant a motion for summary judgment simply because the opposing party has failed to comply with a local rule requiring a response within a certain number of days. *See* NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7-8 (1st Cir. 2002); *see also* Cosme-Rosado v. Serrano-Rodríguez, 360 F.3d 42, 43 (1st Cir. 2004) (*finding* that failure to comply with then Local Rule 311.12 admits the veracity of the movant's version of material facts).[3]

---

[3] In Torres Rosado v. Rotger Sabat, 204 F.Supp. 2d 252 (D. Puerto Rico 2002), *affd.* 335 F.3d 1 (1st Cir. 2003), the presiding judge clearly indicated that oppositions are required by the district court's local rules and, as such, deemed that a motion for summary judgment, and the factual assertions supporting it, to be unopposed, because plaintiff therein

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 6

## MATERIAL FACTS IN CONTROVERSY

**A.   PARTIES' UNCONTESTED/CONTESTED ISSUES:**

1. As of January 2001, all four plaintiffs held trust positions of Executive III at the Department of Education: plaintiff Ivonne Monfort Rodríguez as Director of Center of Investigations and Ethnographic Innovations; plaintiff Flores de Siaca as Facilitator of the Educational Reform Institute for the Education Region of San Juan; plaintiff Carmen Rivera Rivera as Director of the Puerto Rico Statewide Systemic Initiative ("PR-SSI"); and plaintiff Coss Martínez as Director of the Physical Education Program. *Defts' Uncontested ¶1.* [4]

Plaintiffs submit as clarification to above defendants' uncontested statement that co-plaintiff Juanita Flores had been named Executive III, and then Executive II, a trust position, on February 28, 1996. *Plaintiffs' Uncontested ¶1; Plaintiffs' Exhibit II, Flores' depo., pp. 12, 18, 19, 20; Plaintiffs' Exhibit XIV*.

2. The Organic Law of the Department of Education defines confidential and career employees:

> The Department shall have confidential and career employees. The confidential employees shall be those who are substantially involved with the establishment and implementation of the public policy of the Department or who advise or render services directly to the Secretary. All other employees shall be career employees. Personnel recruitment shall be governed by the regulations established for that purpose.

---

had failed to timely file his opposition (*holding* that the district court in Puerto Rico is justified in having one party's uncontested facts to be admitted when the other party fails to file oppositions in compliance with local rules). The moving party's uncontested facts and other evidentiary facts of record on an uncontested motion for summary judgment must still show that said party would be entitled to summary judgment. *See* Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 4 (1st Cir. 2003).

[4] It should be noted that defendants have failed to provide any reference to record in support of this contention.

The Department and the schools shall administer their own personnel systems without being subject to §§ 1301 et seq. of this title, known as the "Puerto Rico Public Service Personnel Act". Furthermore, the Department shall adopt regulations regarding those areas that essentially concern the merit principle and other areas involving the administration of personnel contained in the laws relative to public service matters. The Secretary shall allow the participation of the teaching and non-teaching personnel in the process of outlining their personnel systems.

The determinations on those matters pertinent to the personnel under the merit principle shall be subject to review by the Board of Appeals of the Educational System, created by virtue of §§ 274 et seq. of Title 18.

The following items are essential to the merit principle:
(a) Job classification.
(b) Personnel recruitment and selection.
(c) Promotions, transfers and demotions.
(d) Training programs.
(e) Employee retention.
3 L.P.R.A. § 145q., Exhibit 6B, p. 11; and Ex. 1, Section 3, definition of trust employee. *Defts' Uncontested ¶2.*

Plaintiffs' contention in opposition is the document speaks for itself and defendants' interpretation of the law is objected. *Plaintiffs' Uncontested ¶2.*

3. On or about January 12, 2001, César Rey Hernández, Secretary of Department of Education, sent each plaintiff a letter notifying them that effective January 16, 2001, they would cease to occupy the trust positions held and they would be reinstated to a career position pursuant to applicable laws and regulations. *Defts' Uncontested ¶3; Ex. 2 A-D.*

Plaintiffs' contention is the document speaks for itself and object to handwritten mark on the document. *Plaintiffs' Uncontested ¶3.*

4. Plaintiffs were reinstated to career positions. *Deft's Uncontested ¶4; Exhibit 2 A-D.*

Plaintiffs object to above since nowhere in the document does the term "career" appears, as well as objects the handwritten marks on the document.

As to co-plaintiffs Juanita Siaca and Carmen Rivera, the salaries indicated for the new positions are not in accordance with the January 12, 2001 communication informing they had ceased in their trust appointments. *Plaintiffs' Uncontested ¶4.*

5. Prior to the filing of this complaint, Rey had never met nor known any of the named plaintiffs. *Defts' Uncontested ¶5; Ex. 3, César Rey Hernández' sworn statement, dated October 4, 2002.*

Plaintiffs object to co-defendant Rey's sworn statement as self serving.

Prior to the filing of the complaint, when Rey began as Secretary of Education, he asked for an inventory of the trust positions. To that effect, he commissioned Lizzete Pillich, Secretary of Human Resources, to make such a list. *Plaintiffs' Uncontested ¶5; Plaintiffs' Exhibit IX, César Rey's depo., p. 20, lines 14-22; p. 21, lines 6-17; Plaintiffs' Exhibit X, Lizzete Pillich's depo., p. 3, lines 12-16.*

In the case of plaintiff Carmen Rivera, when Rey was about to start as Secretary, Carmen Rivera wrote a letter telling him that: she was a trust employee;  she had remained in her position of trust and would like to remain there since she was taking an early retirement; and she would be in the position for only six months until the date of retirement. *Plaintiffs' Exhibit III, Carmen Rivera's depo., p. 33, lines 9-25; p. 34, lines 1-21.* In consequence, Rey's statement under oath that, prior to the filing of the complaint he had not known any of the named plaintiffs, is considered not true. In this respect, on January 12, 2008 he even addressed a communication to each plaintiff informing them the ceasing of their trust appointments. *See Defendants' Exhibit 2.*

6. Prior to the filing of this complaint, Rey had no knowledge of plaintiffs' political affiliation. *Defts' Uncontested ¶6; Exhibit 3.*

Plaintiffs object to co-defendant Rey's sworn statement as self serving.  As already stated in *Plaintiffs' Uncontested ¶5 above,* prior to the filing of the complaint, when Rey began as Secretary of Education, he asked for an inventory of the trust positions and to that effect, he commissioned Lizzete Pillich, Secretary of Human Resources, to make such a list. All those persons included in the list of trust positions were named by the past administration, the N.P.P.  *Plaintiffs' Exhibit X, Lizzete Pillich's deposition,  p. 36, lines 15-25; p. 37, line 1.*

According to plaintiff  Monfort, knew her political affiliation for reason that in the Department of Education many people know her and know her political affiliation, and for reason that as soon as he arrived at the Department, co-defendant Rey issued a communication to remove her from her position. *Plaintiffs' Exhibit I, p. 49, lines 2-21.*  Everybody in the Department knew of Monfort's political affiliations. *Plaintiffs' Exhibit VIII, p. 49, lines 2-10.* Plaintiff Monfort was substituted in her position as Director of the Center on January 8, 2001 by a person named Lydia González, who is a P.D.P. sympathizer. *Plaintiffs' Exhibit I, p. 82, lines 1-21; Plaintiffs' Exhibit VIII, p. 48, lines 10-16.*

Defendant Rey knows plaintiff Flores is N.P.P. because she worked in the San Juan Educational Region visiting 196 schools where she is known.  In those schools, there are N.P.P. sympathizers who have seen her in N.P.P. activities and also in the schools there are P.D.P. sympathizers who must have told him so. *Plaintiffs' Exhibit II, p. 49, lines 12-21.*  As soon as the P.D.P. administration commenced in the year 2001, Heriberto Crespo, Millie Aponte and Noemi Ortiz took charge of the San Juan Educational Region and did not

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 10

permit plaintiff Flores to visit schools as facilitator. They were always asking her what she was doing. These persons are P.D.P. sympathizers and they know plaintiff Siaca is a N.P.P. member. They also received orders from Lizzette Pillich, Director of Human Resources. *Plaintiffs' Exhibit II, p. 52, lines 6-25; p. 58, lines 8-25; p. 59, lines 1-3; p. 94, lines 18-24; p. 95, lines 7-18.* Plaintiff Flores was substituted as facilitator by Claribel Rivera Casanova, a P.D.P. affiliate. *Plaintiffs' Exhibit II, p. 117, lines 3-7.*

Mrs. María Moran, Technician of the Science Course at the Department, and now Director of the Science program, and a fellow worker Teresa Vega, tried to help María Rivera to remain in her trust position, but they were told that all trust employees who were N.P.P. were going to be removed. *Plaintiffs' Uncontested ¶ 6; Plaintiffs' Exhibit III, p. 39, lines 3-25.*

Plaintiff Rivera always identified herself in the Department as a N.P.P. sympathizer. *Plaintiffs' Exhibit III, p. 41, lines 19-25.*   Rivera does not know of any removed trust employee who was not a N.P.P. follower. Everyone who occupied a trust position was blacklisted because the N.P.P. followers were going to be removed.  *Plaintiffs' Exhibit III, p. 91, lines 1-4, 22-25.* Rivera was substituted in her position by Jorge Vázquez, who was a P.D.P. sympathizer. *Plaintiffs' Exhibit VII, p. 24, lines 1-14.*

Everybody at the Department of Education, the personnel who works at the Academic Services, knew plaintiff Coss' political affiliation. *Plaintiffs' Exhibit IV, p. 41, lines 8-18.* Plaintiff Coss is affiliated to the N.P.P.; she is politically active; who has been an electoral college official, and who participates in all political activities, walks, meetings. *Plaintiffs' Exhibit IV, p. 42, lines 7-20.*

On January 8, 2001, when Rey started at the Department of Education, he solicited from an employee by the name Cheryl Nuñez to look in Coss' file for her social security number. *Plaintiffs' Exhibit IV, p. 44, lines 8-17.* When Rey arrived at the Department, Teresa Vega, Cheryl Nuñez, P.D.P. sympathizers and other persons identified with the P.D.P., determined who were the persons who belonged to the N.P.P. *Plaintiffs' Exhibit IV, p. 56, lines 7-14.* The person who substituted Coss as Director, Mr. Jorge Colón, is a sympathizer of the P.D.P. *Plaintiffs' Exhibit IV, p. 61, lines 2-14.* In consequence, it can not be stated categorically, nor without a doubt, that defendant Rey, prior to the filing of the complaint, had no knowledge of plaintiffs' political affiliation. *Plaintiffs' Uncontested ¶6.*

**AS TO PLAINTIFF MONFORT:**

7. Plaintiff Monfort was appointed to the trust position of Director of Center of Investigations and Ethnographic Innovations on July 1, 1998, position #R00062, earning a monthly salary of $2,784.00. *Defts' Uncontested ¶7; Ex. 4; Ex. 2A.*

8. The position was defined as Executive III and was number 8 of a total of 14 on the Retributive Structure for Employees in the Trust Service. *Deft's Uncontested ¶8; Ex. 5.*

9. Law Number 18 of June 16, 1993 created the Center of Investigations and Ethnographic Innovations. *Defts' Uncontested ¶9; Ex. 7, p.1.*

Plaintiffs accept above defendants' uncontested ¶¶7-9.

10. The Organic Law of the Department of Education of 1999 was the culmination of the Integral Reform of the System of Public Education in Puerto Rico which had been promoted by the Government of Puerto Rico since 1993, based on an electoral mandate. *Defts' Uncontested ¶10; Ex. 6A.*

Plaintiffs' objection to above is the document speaks for itself and object to defendants' interpretation. *Plaintiffs' Uncontested ¶10.*

11. The 1999 Organic Law of the Department of Education provides the following as to the Center of Investigations and Ethnographic Innovations:

The Secretary shall establish an Educational Research and Innovations Center to pursue the following goals:

(a) Research and collect information on the problems facing the field of education in Puerto Rico.
(b) Conduct experiments with new ways in which to organize the teaching and exercise the learning processes.
(c) Draft and [try out] new curriculums for the courses offered.
(d) Design programs to take advantage of the talent, capability and experience of the teachers and students in activities that complement those that are developed in the classroom.
(e) Gather pedagogical research materials and innovations produced in and outside of Puerto Rico.
(f) Evaluate research projects proposed by the teachers of the public education system and defray the corresponding cost of those approved by the Secretary.
(g) Establish a network of collaborative schools to participate in the research and experimental projects of the Center.
(h) Promote the creation of consortiums with universities to conduct research projects.
(I) Submit annual reports to the Governor of Puerto Rico and the Legislature on the achievements and operations of the Center. July 15, 1999, No. 149, § 5.08. 3 L.P.R.A. § 145k (2005).

*Defts' Uncontested ¶11; Ex. 6B.*

Plaintiffs deny above. Defendants' Exhibit 6B refers to "Educational Research and Innovations Center". However, the trust position occupied by plaintiff Monfort was in the "Center of Investigations and Ethnographic Investigations". *Plaintiffs' Uncontested ¶11.*

12. The law further provides that "[t]he Center shall be directed by a Director appointed by the Secretary and be attached to the Office of the latter." July 15, 1999, No. 149, § 5.09. 3 L.P.R.A. § 145l. *Defts' Uncontested ¶12; Ex. 6B.*

Plaintiffs deny on same grounds above ¶11. *Plaintiffs' Uncontested ¶12.*

13. The 1999 Organic law provides the following, among others, related to the academic duties and obligations of the Secretary of the Department of Education: "The Secretary, as academic director of the Puerto Rico Public Education System, shall:

(n) Organize incentive programs to enhance the professional advancement of the teachers and the teaching support personnel." 3 L.P.R.A. § 145t. Ex. 6B.

*Defts' Uncontested ¶13.*

Plaintiffs' objection is the document speaks for itself and object to defendants' interpretation. *Plaintiffs' Uncontested* ¶12.

14. The inherent duties of the position, (Director of the Center for Educational Research and Innovation) as described in the Certification of Duties of Position Executive III, the official job description for the position, consisted of the following:

**a.** Planning, organizing and supervising assigned work related to the Center for Educational Research and Innovative Program;
**b.** Determining the needs for technical or professional training for the personnel assigned under her supervision;
**c.** Developing norms and procedures, outlining work programs, and interpreting statutes and regulations applicable to the matters for which she was responsible;
**d.** Coordinating interagency efforts in matters so requiring;
**e.** Creating a work plan based on the program's needs in keeping with the vision, goals, and objectives of the Department of Education;
**f.** Identifying problems that affected the evaluation and measurement process and presenting pertinent recommendations to solving them;
**g.** Developing in coordination with evaluation supervisors, regional directors, and school superintendents, tests and other evaluation and

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 14

measurement instruments needed in the educational regions to ensure
that the outline objectives were achieved;
**h**. Observing and advising on faithful compliance with the goals and
objectives of the Department of Education and the Education Research
and Innovation Program;
**I.** Preparing reports concerning her program as requesting by the Office
of the Deputy Secretary for Teaching;
**j.** Representing the Office of the Deputy Secretary for Teaching at
activities assigned to her;
**k**. Collaborating and participating in the implementation of the public
policy of the public education system.

*Defts' Uncontested ¶14;* Ex. 8, Certification of Duties of Position Executive III

(Director of the Center for Educational Research and Innovation), signed by Evelyn Vicente,

Director, Classification and Compensation Division on June 4, 2002.

Plaintiffs deny above defendants' uncontested statement. Said unsworn statement is

not a formal or official job description. It is considered a self serving inaccurate, hearsay,

certification prepared on June 4, 2002, not in the normal course of business, but for a specific

purpose of defending Rey in relation to the filing of the complaint on March 7, 2001. Said

certification refers to the "Center for Educational Research and Innovations", while the trust

position occupied by plaintiff Monfort was in the "Center of Investigations and Ethnographic

Investigations". In addition, it misleadingly indicates that plaintiff Monfort occupied her trust

position from August 1, 2000 to January 15, 2001, when preceding Statement of fact #7 presented

by the same defendants states clearly that plaintiff Monfort was appointed to her trust position on

July 1, 1998. In addition, according to plaintiff Monfort, who started to work with the Department

of Education in the 1980's, was named Director of the Center of Investigations and Ethnographic

Innovations of the Department of Education, a trust position, on July 1, 1998. *Plaintiffs' Exhibit*

*I, Plaintiff Yvonne Monfort's depo., p. 18, lines 17-23; Exhibit XII.*

In relation to the functions indicated in said certification, the same are objected, especially the last one, where, it is indicated that plaintiff Monfort "collaborated and participated in the implementation of the public policy of the public education system." Said self serving personal opinion of Ms. Evelyn Vicente, alleged director of Classification and Compensation Division, is not made in the regular course of business but to be used for a specific purpose in relation to the complaint filed in the present case.  Said self serving personal opinion of Ms. Evelyn Vicente, goes against the sworn evidence in the present case, including the following:

According to plaintiff Monfort, the functions of the Director of the Center were included in a list and were already stipulated; these functions included preparing workshops for the professional development of teachers, do research for the system, and all the administrative functions of an office. *Plaintiffs' Exhibit I, p. 25, lines 4- 18.*

The investigations carried out by the Center were related with the academic areas; the academic progress of the students; the workshops were of professional development; to develop the teachers, so to make investigations in the classroom. *Plaintiffs' Exhibit I, p. 28, lines 2-6; p. 29, lines 14-18.*

Plaintiff Monfort, as Director of the Center, did not have discretion in relation to the contents of the workshops.  All the work the Center was going to do had to be submitted to the Sub-Secretary of Education, who decided the contents of the workshops and assigned the investigations to be made.  The Sub-Secretary corrected the work and gave directions of what the Center was going to do.  The Center not plaintiff Monfort took all decisions related to everything, same as to the contents of the workshop or dates of the same. *Plaintiffs' Exhibit I, p. 28, lines 20-25; p. 29, line 1; p. 37, lines 7-25.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 16

At the start of the work of the Center, the Sub-Secretary gave the Center a work draft that was to serve as a guide for all posterior drafts related to the workshops. *Plaintiffs' Exhibit I, p. 40, lines 11-25.* Said original work draft was modified by the Sub-Secretary, where the decisions were taken, according to the existing needs. *Plaintiffs' Exhibit I, p. 42, lines 5-7.*

All investigations carried out by the Center were directly assigned by the Sub-Secretary. *Plaintiffs' Exhibit I, p. 42, lines 20-23.*

According to Lizzette Pillich, Auxiliary Secretary of Human Resources under Rey, in plaintiffs' cases, the necessity of political affiliation to the P.D.P. to occupy trust positions was not determinative; plaintiffs' position of trust did not have any powers, only functions. *Plaintiffs' Exhibit X, p. 52, lines 6-10; p. 67, lines 14-25; p. 68, lines 1-5.* Lizzette Pillich could not say if plaintiffs in their trust positions formulated public policy, nor did she know if plaintiffs in their trust positions held confidential information. *Plaintiffs' Exhibit X, p. 70, lines 2-8; p. 71, lines 24-25; p. 72, lines 1-3.*

According to Hilda Cortés Figueroa, Director of the Faculty Personnel Division, Human Resources, political affiliation was not necessary for plaintiffs to occupy their trust positions. *Plaintiffs' Exhibit XI, p. 20, lines 24-25; p. 21, lines 1-3.*

As a result, in the present case there exists an essential and substantial controversy of facts related to the actual functions that plaintiffs performed.

15. The Center was one of the offices that was attached to the Office of the Secretary of the Department of Education. *See Ex. 9* (Transition Committee, 1.1.1.1 Secretary of Education, Organizational Structure, Directive level)("In addition, there are offices attached

[to the Office of the Secretary] with assessing functions that put forward the decisional processes and define the implementation of the public policy, these are: …. Center of Investigations and Ethnographic Innovations"). *Defts' Uncontested ¶15.*

Plaintiffs deny above defendants' uncontested as inadmissible. It is not known who prepared the document submitted by defendants or for what purpose. Said document is not signed and it lacks the logo of the Department of Education. In addition, the content of the document is not final since it clearly states in the lower part of the document it is a "Draft for discussion only". *Plaintiffs' Uncontested ¶15.*

16. While Monfort was the Director, the Center undertook approximately 1-2 projects a year that lasted approximately 8-10 months each and prepared approximately 25 teachers per year. The projects were to prepare teachers to conduct research in the classroom and were grounded on the theory of behaviorism following the passage of the Community Schools Act of 1993. The material was the same each year and was repeated for new groups of teachers. *Defts' Uncontested ¶16; Ex. 10, p. 29-31; 41; 44.*

Since the deposition speaks for itself, defendants' personal interpretation is objected. *Plaintiffs' Uncontested ¶16.*

17. Monfort reported to the Undersecretary for Teaching, Luz Ivette Cruz. *Defts' Uncontested ¶17; Exhibit 10 at 28-29.*

Plaintiffs deny above. The two pages of the deposition referred to by defendants do not indicate that plaintiff Monfort "reported to the Undersecretary of Teaching, Luz Ivette

Cruz". Said two pages, without mentioning any name, indicate that the research program was not of discretional nature but assigned through the Undersecretary of Teaching. *Plaintiffs' Uncontested ¶17.*

18. As Director, Monfort supervised 5 employees of the Department of Education – three secretaries, a researcher and another person who collaborated at the Center. *Defts' Uncontested ¶18; Exhibit 10  at 25.*

Plaintiffs accept above ¶18.

19. Monfort stated that she did not have complete discretion in the creation of the workshops because she depended on the approval of the Undersecretary. She did admit that she was in charge, with approval, of selecting the workshop's subject. *Defts' Uncontested ¶19' Ex. 10, p.37, lines 2-24.*

Plaintiffs deny above defendants' uncontested fact.  Plaintiff Monfort clearly states in said deposition, page 37, cited by defendant, that in the Center they "had to submit all the work that we would do to the Undersecretary of Teaching" and they were the ones who decided which subject matter would be utilized; the Center would be given the directives as to what they were going to do; the Center did not take any decision in relation to anything, not even in relation to the content of the workshops. *Plaintiffs' Uncontested ¶19.*

20. Plaintiff Monfort was reinstated to the career position of Auxiliary Superintendent IV, position number #F00096, earning a monthly salary of $2,212.00. *Defts' Uncontested ¶20; Ex. 10 at 58; Ex. 2e and Ex. 4.*

Plaintiffs object the part where it states that plaintiff Monfort was reinstated to a career position. In the documents, there is no mention to the term "career". (Plaintiffs'

Exhibit 10 at 58 was not included in the documents notified by defendants). In addition, it must be noted, according to the documents, that plaintiff Monfort would be on probation in the position assigned. *Plaintiffs' Uncontested ¶20.*

21. To support her harassment and persecution claim, Monfort further claims that she was sent to an office with a broken down desk, a chair that she had to take home with her and which contained fungus, like the rest of the building. *Defts' Uncontested p. 21; Ex. 10 at 54-55.*

Plaintiffs object the part "like the rest of the building." Nowhere on the pages of the deposition referred to by defendants, at pp. 54-55, does it state "like the rest of the building, plaintiff's assigned office contained fungus." It is on page 60 of the deposition where plaintiff Monfort indicates that the acoustical tiles of the whole building were full of funguses, but it was in the office assigned to her, that the leaks would drip down. The rest of this statement is accepted with the qualification that, according to the deposition referred to, plaintiff Monfort did not have a chair to sit down and that she was changed of office approximately four months later, after she had to go twice to the hospital and to the State Insurance Fund because of the fungus, and after she had filed a complaint under ADA for reasonable accommodation. *Defendants' Exhibit 10, pp. 54-56.*

In relation to the harassment and persecution claim, plaintiff Monfort has been a member of the N.P.P. all her life. *Plaintiffs' Exhibit I, p. 48, lines 12-19.* Plaintiff Monfort believes Rey knew her political affiliation for reason that in the Department of Education

many people know her and know her political affiliation, and because as soon as he arrived at the Department, he issued a communication to remove her from her position. *Plaintiffs' Exhibit I, p. 49, line 2-21.*

Plaintiff Monfort was on sick leave and reported to the State Insurance Fund approximately on December 20, 2000. Defendant Rey started at the Department of Education on January 8, 2001; on that same date a memorandum was issued naming a transitory coordinator for Monfort's position. On January 12, 2001, Rey issued a letter removing Monfort as Director of the Center effective January 15, 2001, which letter she had to pick up at the Department on January 18, 2001, due to all the calls placed for her to pick it up although she was on sick leave. *Plaintiffs' Exhibit I, p. 50, lines 8-25; p. 51, lines 1-22; p. 53, lines 12-25; p. 54, lines 1-14; Plaintiffs' Exhibit XIII.*

When plaintiff Monfort was taken out of her position as Director of the Center, she was sent to an office which did not have a chair to sit down. She had to bring a chair from her home; the desk assigned to her was old and broken; the office was full of fungus on the ceiling. She asked to be transferred from said office, but it was not until about four months later, and after she had to go to the hospital two times because of the conditions of the office and after she had solicited a reasonable accommodation under ADA, that she was finally transferred to another office, which was in the same condition as the prior office, with the fungus on the ceilings. *Plaintiffs' Exhibit I, p. 54, lines 21-25; p. 55, lines 1-25; p. 56, lines 23-24; p. 57, lines 1-25.* As a result of absorbing the fungus from the ceiling, plaintiff Monfort acquired a condition called rhinopharingitis. *Plaintiffs' Exhibit I, p. 62, lines 14-24.*

She still has to go every month to an allergist who administers her all Tuesdays three vaccines; the condition cannot be cured, only controlled. *Id., p. 110, lines 6-22.*

After being removed from her position as Director of the Center, Monfort returned to the position of Auxiliary Superintendent IV, but without the functions related to the federal program Title I she had before becoming Director of the Center. *Id., p. 71, lines 1-19.*

Plaintiff Monfort was substituted in her position as Director of the Center on January 8, 2001 by a person named Lydia González, who is a P.D.P. sympathizer. *Id., p. 82, lines 1-21; Plaintiffs' Exhibit VIII, p.48, lines 10-16.* Plaintiff Monfort had all the preparation to remain as Director of the Center and the person who substituted her is less prepared. *Plaintiffs' Exhibit I, p. 92, lines 13-22.* Plaintiff Monfort complied with all the requisites for the position of Director of the Center and was performing a good job, and aside from the political situation, there was no reason for her removal. *Id., p.118, lines 5-8.*

Plaintiff Monfort participated in political activities, in all activities in which participation was needed; walks, meetings; she also gave training and orientation on the electoral process to members of the N.P.P.; she is the person in charge of all training in Precinct II of San Juan. *Id., p. 119, lines 19-25; p. 122, lines 8-21; p. 123, lines 5-13.*

As Director of the Center, Monfort received a salary of $2,784.00, and when removed from said position, she started to earn a salary of $2,212.00 as Auxiliary Superintendent IV. *Id., p. 120, lines 2-11; Plaintiffs' Exhibit XIII.*

In relation to her profession, the dismissal from her trust position affected Monfort. After leaving the Department, she was interviewed by a private university for a position, but removal from the trust position affected her opportunities of getting employed with this

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 22

private university, thus not being able to obtain the employment. *Plaintiffs' Exhibit I, pp. 94, 95, 97.*

As a direct result of her removal from her trust position, Monfort developed a major depressive disorder, needing psychiatric treatment. *Plaintiffs' Uncontested ¶21; Plaintiffs' Exhibit XX.*

22. Monfort complained about the conditions of the office to which she was assigned, but recognizes that she was moved from the first office, that the whole building suffered from the conditions about which she complained, and that after approximately four months she was moved to a new district and the conditions at the new area were improved. *Defts' Uncontested ¶22; Exhibit 10 at pp. 54-6, 59, 60, 63, 64.*

Plaintiffs admit above with the same clarification as ¶21. She was sent to an old school and the improvement in conditions consisted in that she now had chair to sit down and that there were no fungus in the environment. *Plaintiffs' Uncontested ¶22.*

23. Monfort complained that she was not assigned additional tasks in her career position after reassignment, such as work on the budget, but admits that she performed the tasks of the position and that the discretionary tasks that she was not assigned, such as the work on the budget, were sensitive areas. Furthermore, once she switched districts, Monfort admits that she was granted fuller independence to perform her functions. *Defts' Uncontested ¶23; Exhibit 10 at pp. 64, 65, 70, 75, 80, 120.*

Plaintiffs object since the pages of the deposition referred to by defendant s clearly reveal that plaintiff Monfort was not assigned any tasks; that she knew her tasks and the duties of her position and she exercised them; that of the tasks inherent to her position as Deputy

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 23

Superintendent she did not perform and/or was not assigned the tasks related to the Title I budget. The tasks related to the Title I budget were not additional tasks nor discretionary tasks, but inherent to her position, part of her duties, regardless if it was a sensitive area.  Furthermore, it was when she was changed to a new district with a new supervisor, six or seven months later, (remembering, according to the prior discussion of statement of fact #21, that plaintiff Monfort did not have a chair to sit down and that she was changed of office after she had to go twice to the hospital and the State Insurance Fund for reason of the fungus, and after she filed a complaint under ADA for reasonable accommodation) that she had full autonomy to work with the program, with the supervision of the Superintendent of Schools.  *Plaintiffs' Uncontested ¶23.*

24. Rey was not personally involved in the decision to assign Monfort to any particular physical location nor the tasks assigned. *Defts' Uncontested ¶24.*

Plaintiffs object and deny above since defendants' statement is not sustained nor justified in any way. Defendant Rey is the one, through his communication of January 12, 2001 (*Defendants' Exhibit 2-A*), who transferred plaintiff Monfort to her position as Auxiliary Superintendent in San Juan II.  *Plaintiffs' Uncontested ¶24.*

25. No one new was brought in to replace Monfort. *Defts' Uncontested ¶25; Ex. 11 at 28.*

Plaintiffs deny above since it is clear by the referred page of the deposition and by page 27, that Lydia González became the director of the office in charge of the same, supervising all the employees. As already stated in reference to Statement of Fact #6,

Monfort was substituted in her position as Director of the Center on January 8, 2001 by a person named Lydia González, who is a P.D.P. sympathizer. *Plaintiffs' Uncontested ¶ 25; Plaintiffs' Exhibit I, p. 82, lines 1-21; Plaintiffs' Exhibit VIII, p. 48, lines 10-16.*[5]

26. Lydia González had been an employee of the Department of Education before, and had been on assignment to the Institute of Culture (*Ex. 10 at 26*), who later became the director of the office. *Defts' Uncontested ¶26; Ex. 10 at 84-86; Ex. 11 at 27.*

Plaintiffs accept above with the qualification Ms. Lydia González substituted plaintiff Monfort in her position as Director of the Center on January 8, 2001. *Plaintiffs' Uncontested ¶26; Plaintiffs' Exhibit I, p. 82, lines 1-21; Plaintiffs' Exhibit VII, p. 48, lines 10-16.*

27. There was a reduction of one person in the Ethnographical Research Center from a total of 4 to 3. *Defts' Uncontested ¶27; Ex. 11 at 26-27-38.*

Plaintiffs object to above. There was no reduction of personnel. Lydia González, according to the deposition cited by defendant, who was at the office, although she was assigned to do some work at the Institute of Culture, occupied the position of Director I and was a P.D.P. sympathizer. She substituted plaintiff Monfort. *Plaintiffs' Uncontested ¶27.*

28. Once Lydia González took up a position, however, the functioning of the Office of Ethnographical Research changed. *Deft's Uncontested ¶28; Exhibit 11 at 34.*

29. The name of the unit changed to Research in Action; and the director of the office

---

[5]   Notice is also taken, since this is a relevant issue in controversy, that the Court of Appeals noted upon a close review of the record, there was adequate circumstantial basis for concluding both that Rey was aware of plaintiffs' political allegiance to the N.P.P. and that plaintiffs were replaced with P.D.P. loyalists. *See* Ivonne Monfort-Rodríguez v. César A. Rey-Hernández, No. 06-1624, slip op. at p.9 (1st Cir. October 18, 2007).  Reference to Pillich's testimony as to N.P.P. trust employees being replaced by P.D.P. members also appears at p. 12.  Furthermore, at page 5, n. 7, the Court of Appeals noticed that each appellant [plaintiffs herein] had identified their successors.

makes all the decisions, is involved in details, takes the initiative in offering workshops, in selecting dates, following her own criteria. *Defts' Uncontested ¶29; Exhibit 11 at 34, 35.*

30. Monfort admits that she does not know defendant Rey. *Defts' Uncontested ¶30; Ex. 10 at 48.*

Plaintiffs accept above ¶¶28-30, with the clarification at ¶30 that she does not know Rey personally.

31. Monfort assumed that the Secretary of the Department of Education knew her political affiliation, but does not know if the Secretary of Education indeed knows her political affiliation. *Defts' Uncontested ¶31; Exhibit 10 at 49.*

Plaintiffs object above. According to the referred page of the deposition, plaintiff believes Rey knows her political affiliation because in the Department many people know her and her political affiliation and for reason that Rey, as soon as he arrived at the Department of Education, removed plaintiff from her trust position. *Plaintiffs' Uncontested ¶31.*

32. Monfort claims that several people at the Department of Education have knowledge of her political affiliation. *Defts' Uncontested ¶32; Exhibit 10 at 50.*

Plaintiffs object above since according to the referred page of the deposition, "many" people, not "several", in the Department know plaintiff and her political affiliation. *Plaintiffs' Uncontested ¶32.*

33. Monfort admits that when Rey took the position of Secretary of Department of Education, she was absent from the agency due to sick leave and was still on sick leave when she received the letter from Rey reinstating her to a career position. *Defts' Uncontested ¶33; Ex. 10 at 52, 53.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 26

Plaintiffs deny above statement. Plaintiff Monfort did not "admit" anything. She just stated in the referred deposition that she was sick at home and everyday persons from the Department would call her secretary several times to locate plaintiff, so she would receive a letter, not saying what the letter was about (which was the letter from Rey removing her from the trust position); then the secretary would call her in a frenzy, that plaintiff should go to the office to pick up the letter; plaintiff who was really sick, and practically could not get up and almost unable to speak, because from the Department were calling so much, had to get out of bed and go to the Department to pick up the letter. *Plaintiffs' Uncontested ¶33.*

34. Monfort does not know who took the decision to remove her from the trust position and reinstate her in a career position. *Def't's Uncontested ¶34.*

Plaintiffs object and deny above. Defendants' alleged statement is not sustained nor justified in any way. On the other hand, plaintiff knows who removed her from her trust position, since defendant Rey is the one, through his communication of January 12, 2001 (*Defendants' Exhibit 2-A*), addressed and received by her, who removed plaintiff from her trust position and transferred her to the position of Auxiliary Superintendent in San Juan II. *Plaintiffs' Uncontested ¶34.*

35. Rey was not involved in the details of where she was reinstated, the conditions specific to her physical office or the relationship with the people with whom she worked. *Def't's Uncontested ¶35.*

Plaintiffs objects and deny above on same grounds raised ¶34.

36. On December 28, 2001, Monfort retired effective December 31, 2001, at a monthly salary of $2,312.00. *Defts' Uncontested ¶36; Ex, 10 at 63; Ex. 4.*

Plaintiffs admit above with the qualification that plaintiff retired in accordance to the Early Retirement Act. *Plaintiffs' Uncontested ¶36.*

## AS TO PLAINTIFF FLORES SIACA:

37. Plaintiff Juanita Flores Siaca was appointed to the trust position of Executive Director II, Executive Facilitator for the Institute of Educative Reform at San Juan Educative Region on March 1, 1996, earning a monthly salary of $2,744.00 (Executive II #T00069/T80923/T98024). Ex. 14 at 18, 20. *Deft's Uncontested ¶37.*

Plaintiffs deny above in part. Plaintiff Flores was named "Executive" Facilitator. The numbers for the position T60923/T98024 are also denied. The documents presented to allegedly sustain this statement only reflect that Flores was named Facilitator, not "Executive" Facilitator, and do not include said numbers. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶37.*

38. Since 1993, the Government of Puerto Rico had been promoting the Integral Reform of the System of Public Education in Puerto Rico based on an electoral mandate. *Defts' Uncontested ¶38; Ex. 6A, Exposition of Motives of Law 149, July 15, 1999.*

Plaintiffs deny above as to said reform being "based" on an electoral mandate. The Exposition of Motive of the Law clearly states that it is the government, supported in the electoral mandate, that has been promoting the reform. *Plaintiffs' Uncontested ¶38.*

39. Law Number 18, of June 16, 1993, created the Community Schools ("Escuelas de la Comunidad") and began the implementation of the new school model through the

Institute of the Educational Reform ("Institute") in order to decentralize administrative, fiscal and academic systems and provide autonomy to the Community Schools. *Defts' Uncontested ¶39; Ex. 7.*

Plaintiffs deny in part above statement, with the exception that Law 18 of June 16, 1993, which created and developed the schools of the community, the rest of the statement is denied since the document used as a base does not indicate in any way what defendants allege in their statement. In addition, said statement is denied as inadmissible. According to the document, it is not known who prepared the same nor for what purpose; it is not signed; it does not even have the logo of the Department of Education; and the contents of the document is not final.  It clearly states in the lower part that the document is a "Draft for discussion only". *Plaintiffs' Uncontested ¶39.*

40. In addition to creating community schools, Law Number 18 established school councils; created the positions of facilitators for the community schools; created the Institute for the Educative Reform, establishing its powers and faculties; created the position of council of assessors of the Institute of the Educative Reform; and established the Center for Educative Investigations and Innovations. *Defts' Uncontested ¶40;  Ex. 7 (Summary of Laws Approved between 1992-2000 by the Department of Education, Transition Report, November 17, 2000).*

Plaintiffs deny above in that Law 18 established the school councils. What the document referred to clearly states is that said law established the functioning of the school councils. However, said statement is denied as inadmissible. According to the document, it is not known who prepared the same nor for what purpose; it is not signed; it does not

even have the logo of the Department of Education; and the contents of the document is not final.  It clearly states in the lower part that the document is a "Draft for discussion only".  *Plaintiffs' Uncontested ¶40.*

41. The Institute completed its task of reorganization and transformation in 5 years, and the Organic Law of 1999 represents the culmination of the structural and functional reform. *Defts' Uncontested ¶41; Ex. 6A, p. 5.*

42. The Organic Law of 1999 states the following related to the duties of the facilitator:

> "The facilitators shall not exercise executive, investigative, assessment or supervisory duties in the schools. They shall render support services to the teaching process and proffer advice on administrative matters when the schools so require through their directors." 3 L.P.R.A. §145x.

*Defts' Uncontested ¶42;  Ex. 6B, p. 21.*

43. Furthermore, the law provides the following in relation to "Administrative and managerial facilitation": "The administrative and managerial facilitation duties shall consist of: (a) Organizing and offering training programs for the directive and administrative personnel of the schools in those areas involving budget preparation and administration, personnel administration, procurement procedures, and fiscal audits." 3 L.P.R.A. §145z. *Defts' Uncontested ¶43; Ex. 6B, p. 22.*

44. The duties and employees of the Institute for Educational Reform shall become part of an Administrative Training and Counseling to Schools Institute to be attached to the Office of the Secretary. The Secretary shall determine, through regulations, the functions of said Institute." 3 L.P.R.A. 145dd.  *Defts' Uncontested ¶44; Ex. 6B, p. 23.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 30

Plaintiffs accept Defendants' Uncontested ¶¶42-44.

45. Certain goals that the Department of Education established for the year 2000, as presented in the Transition Committee Report, include aspects of continuation of the community schools and having the community schools become independent from the central Department of Education, particularly with regards to the administrative structure. *Defts' Uncontested ¶45; Ex. 12 Transition Committee Report, Chapter 1, General Information, 1.2 Programmatic Commitments, stating that the Central Government established public policy, including 24 commitments related to the Department of Education, see Commitment DS33, p. 1-5; Commitment DS39; p. 1-13.*

Plaintiffs deny above. According to the document, the concept of the community schools will be extended so that, for the 1998- 1999 school year, all the schools of the Educational System will be converted to community schools; the community schools were not to become independent of the central Department of Education. According to the document, schools functioned around a centralized system and not as schools of the community. As schools of the community, these were to have teaching, administrative, and fiscal autonomy. To that effect, pursuant to Commitment DS39, according to Law #18 of June 16, 1998, Law for the Development of the Schools of the Community, the new organizational structure will be the following:

**a)** the school, transformed into a Community School, has the power and capacity to administer its resources, adapt its curriculum, and manage its funds;
**b)** The school district will dedicate its efforts to the teaching and professional development;
**c)** The educative region assumed the responsibility for the administration and the support services to the teaching;

**d)** The Central Office of the Department of Education organized
in two areas: Teaching and Administration, in its new role,
revises, establishes and modifies the educative public policy to
accommodate it to the new necessities of the education. (Our
emphasis).

However, according to the document presented by defendants, it is not known who

prepared the same nor for what purpose; it is not signed; it does not even have the logo of

the Department of Education; and the contents of the document is not final.  It clearly

states in the lower part that the document is a "Draft for discussion only".  *Plaintiffs'*

*Uncontested ¶45.*

46.  The position of Executive Facilitator was one of trust and involved

implementation of public policy. *Defts' Uncontested ¶46; Ex. 14 at 19 and 39.*

Plaintiffs deny above.  According to plaintiff Flores' deposition, the Secretary of

Education is the only one who has the determination of establishing public policy, and once

that determination is reached, the implementation falls on the entire established apparatus,

going down by rank. In addition, it is denied that plaintiff Flores was named "Executive"

Facilitator. The documents presented to allegedly sustain this statement only reflect that

Flores was named Facilitator, not "Executive" Facilitator.  *Plaintiffs' Uncontested ¶46.*

47. The inherent duties of the position consisted of the following:

**a.** Participating with the regional director in the planning, organization,
coordination, and supervision of the work produced in the region for
teaching and non-teaching personnel purposes.
**b.** Collaborating in and administering a work plan based on the needs and
priorities of the educational region.
**c.** Studying, analyzing and solving problems that arose in the region and
were delegated to her, in order to achieve greater efficiency in keeping
with the goals and objectives of the department.
**d.** Performing periodical inspections and studies to determine the best use

of available resources.

**e.** Developing norms and procedures, outlining work programs, and interpreting statutes and regulations applicable to the matters for which she was responsible

**f.** Attending meeting (sic), conferences, and activities in her own capacity and on her supervisor's behalf.

**g.** Taking part in studies in the teaching and non-teaching areas that are carried out at the initiative of headquarters or in school districts in relation to the educational system

**h**. Determined the need for technical or professional training of the personnel assigned under her responsibility.

**I.** Prepared and rendered periodic reports of the work performed in the Region.

**j.** Collaborating and participating in the implementation of the public policy of the public education system. (Ex.13, Certification of Duties of Position Executive II (attached to the San Juan Educational Region), signed by Evelyn Vicente, Director, Classification and Compensation Division on June 4, 2002.)

*Defts' Uncontested ¶48.*

Plaintiffs deny above defendants' uncontested.  Said unsworn statement is not a formal or official job description.  It is self serving inaccurate hearsay certification- as part of four certifications prepared for each plaintiff- prepared all of them on June 4, 2002, not in the normal course of business, but for a specific purpose, defending Rey, in relation to the filing of the complaint on March 7, 2001. Said certification does not even mention the title of the position held by plaintiff nor a time period.

In addition, in relation to the functions indicated in said certification, the same are objected, especially the last one, which plaintiffs consider misleadingly and totally incorrectly when it is indicated that plaintiffs "collaborated and participated in the implementation of the public policy of the public education system." This self serving personal opinion of Evelyn Vicente, the alleged director of Classification and Compensation

Division, was not prepared in the regular course of business but to be used for a specific purpose in relation to the complaint filed in the present case. Also, said self serving personal opinion of Evelyn Vicente goes against the sworn evidence in the present case, including the following:

As a facilitator, plaintiff Flores gave training in the fiscal area, dealing with the functions of the purchaser, of the payer, of the receptor, of the banking conciliator, and of the custodian of property; then after the training she gave them technical consulting, if they had any doubts. *Plaintiffs' Exhibit II, p. 31, lines 8-25; p. 32, lines1-10*. She also gave orientation to the School Councils, coordinated with the schools to organize the school councils, and gave technical consultancy. *Plaintiffs' Exhibit II, p. 33, lines 12-17.*

When plaintiff Flores was facilitator in the Institute of Educational Reform she did not take part in the formulation of public policy; she received instructions from the Regional Director, who in turn received instructions from the Institute, which in turn received instructions from the Secretary of Education. *Id., p. 88, lines 10-19.*

According to Pillich, Auxiliary Secretary of Human Resources under Rey, in plaintiffs' cases, the necessity of political affiliation to the P.D.P. to occupy trust positions was not determinative; plaintiffs' position of trust did not have any powers, only functions. *Plaintiffs' Exhibit X, p. 52, lines 6-10; p. 67, lines 14-25; p. 68, lines 1-5.* Pillich could not say if plaintiffs in their trust positions formulated public policy, nor did she know if plaintiffs in their trust positions held confidential information. *Plaintiffs' Exhibit X, p. 70, lines 2-8; p. 71, lines 24-25; p. 72, lines 1-3.*

According to Hilda Cortés Figueroa, Director of the Faculty Personnel Division, Human Resources, political affiliation was not necessary for plaintiffs to occupy their trust positions. *Plaintiffs' Exhibit XI, p. 20, lines 24-25; p. 21, lines 1-3*.  As a result, in the present case exists an essential and substantial controversy of fact related to the actual functions that plaintiff performed.  *Plaintiffs' Uncontested ¶47*.

48. Flores admits that as Executive Facilitator she provided technical advice to the fiscal components to the area and school councils advise and training to all the 196 schools in the San Juan Region. *Defts' Uncontested ¶48; Ex. 14 at 30-31*.

Plaintiffs deny above in part in that plaintiff Flores was an "Executive" Facilitator. The deposition presented to allegedly sustain this statement only reflects that Mrs. Flores was Facilitator, not an "Executive" Facilitator. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶49*.

49. Flores states that she and the other facilitators, would act as umpires when disagreements arose between the community and the council or the faculty, resolving issues when possible and escalating the problems to the Reform Institute or to the Secretary, if agreements could not be reached at a lower level. Further she states that she made recommendations to the Secretary and then would implement the Secretary's directives, including the implementation of the public policy created by the Secretary.  *Defts' Uncontested ¶49; Exhibit 14 at 34, 35, 36, 38, 39; 90-92*.

Plaintiffs object above defendants' statement.  The statement presented by defendants does not reflect accurately what the documents utilized as a base indicate. Plaintiff Flores did not indicate that she made recommendations to the Secretary of

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 35

Education. She just said she made recommendations in the visits report (*p.36, l. 19-20*). In relation to the implementation of the Secretary's directive, plaintiff indicates at page 39 Flores' deposition, that the Secretary of Education is the only who has the determination of establishing public policy, and once that determination is reached, the implementation falls on the entire established apparatus, going down by rank. The mediation areas in which plaintiff participated were related to the fiscal area, and at times she had to be at a school as a facilitator. *See p. 92 of plaintiff's depo. presented by defendants and Plaintiffs' Exhibit A, p. 93 of plaintiff Juanita Flores Siaca's depo.*

When plaintiff Flores was facilitator in the Institute of Educational Reform she did not take part in the formulation of public policy; she received instructions from the Regional Director, who in turn received instructions from the Institute, which in turn received instructions from the Secretary of Education. *Plaintiffs' Exhibit II, p. 88, lines 10-19. Plaintiffs' Uncontested ¶49.*

50. On January 16, 2001, plaintiff Flores was reinstated to the career position of Elementary School Director III earning a monthly salary of $3,545.00. *Defts' Uncontested ¶50; Ex. 14 at 58; Ex. 2B.*

Plaintiffs deny above. First of all, page 58 of defendants' Exhibit 14 does not mention anything about salary. Defendants' Exhibit 2B clearly indicates that the monthly salary in plaintiff Flores' career position was $2,370.00. *Plaintiffs' Uncontested ¶50.*

51. Flores admits that she performed the functions that corresponded to her in the reinstated career position. Further, she recognized that as a result of a centralization

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 36

process, there was a change of the fiscal function, such that it was assumed by the Educational Region instead of the individual schools. *Defts' Uncontested ¶51; Ex. 14 at 39-42; 44-45.*

52. As to the persecution, Flores claims that she received letters from the current Regional Director, who is not a party to this action, that she felt were threatening. And other than that, there were no other problems in her career position. *Defts' Uncontested ¶ 52; Exhibit 14 at 79-80.*

Plaintiffs admit above defendants' uncontested statements ¶¶51-52.

53. As to the allegations of harassment or persecution, Flores bases her claims on the actions of individuals who were in charge of the Educational Region before she was reinstated, who are not parties to this action. She claims she was not allowed to go out to visit the different schools as she had done previously, but admits that there was an order given on the first day paralyzing the outings to the schools. *Defts' Uncontested ¶53; Ex. 14 at 53; 61, 71.*

Plaintiff denies in part above statement. Nowhere in the deposition pages cited it is indicated, as to the allegations of harassment or persecution, that plaintiff Flores "bases her claims" on the actions of individuals mentioned in those pages. What she is stating in those pages is that persons who were cordial with her, after the change of administration in 2000, when they took over the San Juan Educational Region in 2001, began to persecute her.

In relation to the allegation related to visiting different schools, where defendants state plaintiff "admits", plaintiff is not admitting anything. Plaintiff Flores is simply stating that she was given an order to paralyze her outings to the schools. To that effect, as soon as

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 37

the P.D.P. administration commenced in the year 2001, Heriberto Crespo, Millie Aponte

and Noemi Ortiz took charge of the San Juan Educational Region and did not permit Flores

to visit schools as facilitator. They were always asking her what she was doing. These

persons are P.D.P. sympathizers and they know plaintiff Flores is a N.P.P. member. Also,

they received orders from Pillich, Director of Human Resources. *Plaintiffs' Exhibit II, p. 52,*

*lines 6-25; p. 58, lines 8-25; p. 59, lines 1-3; p. 94, lines 18-24; p. 95, lines 7-18.*

Plaintiff Flores was substituted as facilitator by Claribel Rivera Casanova, a P.D.P.

affiliate. *Plaintiffs' Exhibit II, p. 117, lines 3-7.*

In relation to the harassment and persecution claim, it should also be considered

that plaintiff Flores belongs to the N.P.P.; she has been an electoral college official; she is

active in politics; goes to walks and meetings. *Plaintiffs' Exhibit II, p. 48, lines 1-16.*

Defendant Rey knows plaintiff Flores is N.P.P. because she worked in the San Juan

Educational Region, visiting 196 schools where she is known; in those schools are N.P.P.

sympathizers who have seen her in N.P.P. activities, and there are also in the schools P.D.P.

sympathizers who must have told him so. *Id., p. 49,line 12-21.*

Since plaintiff Flores was not allowed to leave the office to visit the schools, she was

in the office doing nothing, no work was given to her, and this lasted until January 22,

2001, when she was removed from the position of facilitator. *Id., p. 78, lines 2-8, 15-24;*

*Plaintiffs' Exhibit XV.*

When plaintiff Flores was a facilitator in the Institute of Educational Reform, she did

not take part in the formulation of public policy; she received instructions from the

Regional Director, who in turn received instructions from the Institute, who in turn

received instructions from the Secretary of Education. *Plaintiffs' Exhibit II, p. 88, lines 10-19.* When Flores assumed the position of School Director, after her dismissal from her trust position, the employees in her school district asked her why she was removed and she felt very humiliated. *Id., p. 110, lines 8-14.* As a result of her removal from her trust position, plaintiff Flores developed an emotional condition characterized by depressive and anxiety symptoms, within the boundaries of a major depressive episode, needing psychiatric treatment. *Plaintiffs' Uncontested ¶53.*

54. Further, Flores admits that although the Institute still exists, it does not operate as it did previously. All aspects of the fiscal area are being moved directly to the Region, "as a matter of policy of the Department and the current administration for centralizing – specifically the tasks or the areas of the fiscal area," and "well then everything is going to change." *Defts' Uncontested ¶54; Ex. 14 at 68, 69.*

Plaintiffs admit above.

55. Flores does not know Rey. *Defts' Uncontested ¶55; Ex. 14 at 48.*

Plaintiff clarifies she does not know Rey personally, although she met him at a meeting. *Defendants' Exhibit 14, p. 49; Plaintiffs' Uncontested ¶55.*

56. Flores is not sure that Rey knows her political affiliation, but assumes that Rey knows her political affiliation based solely on statements from third parties, who are not witnesses in this case. *Defts' Uncontested ¶56; Ex. 14 at 49-50.*

Plaintiffs deny above statement. Defendant Rey knows plaintiff Flores is N.P.P. because she worked in the San Juan Educational Region, visiting 196 schools where she is known; in those schools are N.P.P. sympathizers who have seen her in N.P.P. activities, and

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 39

there are also in the schools P.D.P. sympathizers who must have told him so. *Plaintiffs'*
*Exhibit II, p. 49, lines 12-21*. Rey also knows that plaintiff Flores is a N.P.P. sympathizer and
discriminated against her by removing her from her trust position. *See page 50 of plaintiff's*
*deposition presented by defendants*.

The trust employees in the Department when the P.D.P. administration started were
all affiliated to the N.P.P. *Plaintiffs' Exhibit III, p. 39, lines 19-25*. Carmen Rivera does not
know of any trust employee who was removed who was not a N.P.P. follower. Everyone who
occupied a trust position were blacklisted because the N.P.P. followers were going to be
removed. *Plaintiffs' Exhibit III, p. 91, lines 1-4, 22-25*.

When Rey arrived at the Department, Teresa Vega, Cheryl Nuñez, a P.D.P.
sympathizer, and other persons identified with the P.D.P., determined who were the
persons that belonged to the N.P.P. *Plaintiffs' Exhibit IV, p. 56, lines 7-14*. In consequence,
it cannot be stated that Rey, prior to the filing of the complaint, had no knowledge of
plaintiffs' political affiliation. *Plaintiffs' Uncontested ¶56*.

57. Flores admits that political affiliation is a necessary requirement for trust
positions. *Defts' Uncontested ¶57; Ex. 14 at 58*.

Plaintiffs deny above statement. Page 58 of plaintiff's deposition, cited by
defendants, does not indicate said allegation. *Plaintiffs' Uncontested ¶57*.

58. Flores admits that Rey has never persecuted her. *Defts' Uncontested ¶58; Ex. 14*
*at 102*.

Plaintiffs deny above statement.  Plaintiff Flores clearly indicates she was persecuted and discriminated when Rey removed her from her trust position. *Plaintiffs' Uncontested ¶58.*

59. Flores relies solely upon her removal from trust position regarding political affiliation claim. *Defts' Uncontested ¶59; Ex. 14 at 102.*

Plaintiffs deny above. Plaintiff Flores also relies in the letters she has sent to Rey related to her removal which he did not answer. *See p. 103 of Exhibit 14 presented by defendants.  Plaintiffs' Uncontested ¶59.*

60. Flores complained that there was an order precluding her from going to visit the schools, but recognized that there had been a decision to centralize the functions she had been performing at the Regional Level. *Defts' Uncontested ¶60; Ex. 14 at pp. 53, 61, 68, 69, 71, 120, 121, 128.*

Plaintiffs deny above statement.  Page 69 of Exhibit 14 cited by defendants clearly reveals that the only area that was going to be centralized was the area related to the fiscal area. This did not have anything to do with the school visits.  *Plaintiffs' Uncontested ¶60.*

61. Flores complained about receiving letters from a supervisor, who is not a party to this action, in a tone which she found threatening, but admitted that there had been no consequences from the letters. *Defts' Uncontested ¶61; Ex. 14 at 79, 80, 81, 82, 87, 94.*

Plaintiffs deny above statement since from the pages of the deposition does not appear that there had been no consequences.  *Plaintiffs' Uncontested ¶61.*

62. After January 2001, the position of Executive Facilitator for the Institute of Educative Reform at San Juan Educative Region (Executive II #T00069/T80923/T98024)

remained vacant and was subsequently eliminated. *Defts' Uncontested ¶62; Ex. 4 (Sworn Declaration from Human Resources).*

Plaintiffs deny above statement. As previously stated, plaintiff Flores was Facilitator, not Executive Facilitator. In addition, said declaration, not a formal job description, is a self serving inaccurate hearsay certification prepared not in the normal course of business, but for a specific purpose related to the complaint in the present case. Also, said certification is ambiguous, not indicating when the referred position was allegedly eliminated, and there is evidence that plaintiff's trust position was occupied after plaintiff Flores was removed. Plaintiff Flores was substituted as facilitator by Claribel Rivera Casanova, a P.D.P. affiliate. *Plaintiffs' Exhibit II, p. 117, lines 3-7.  Plaintiffs' Uncontested ¶62.*

**AS TO PLAINTIFF RIVERA RIVERA**:

63. Plaintiff Carmen Rivera Rivera was appointed to a trust position of Executive Director III of the Puerto Rico Statewide Systematic Initiative for Science and Mathematics (#T99902/on 7/1/00 #T00096) on October 19, 1999, earning a monthly salary of $2,556.00. *Defts' Uncontested ¶63; Ex. 16 at 14; Ex. 2C.*

Plaintiffs qualify defendants' statement in that according to the documents referred by defendants, plaintiff Rivera started in her trust position of Director (not Executive Director) of Puerto Rico SSI on October 16, 1999, earning a monthly salary of $2,959.00. *Plaintiffs' Uncontested ¶63.*

64. One of the three principal focus points of the Integral Reform of the Public Education System promoted by the Government of Puerto Rico since 1993, under an electoral mandate, was the Programmatic and Substantive Reform which included the

"incorporation of effective forms and methods for the teaching of languages, science and mathematics, and the professional growth of teachers." *Defts' Uncontested ¶64; Ex. 6B.*

Plaintiffs deny above defendants' statement which statement could not be determined from the document referred to by defendants. *Plaintiffs' Uncontested ¶64.*

65. Certain of the goals of the Department of Education for the year 2000, as established in the Transition Committee Report, include strengthening of the teaching of Mathematics and Science within a systematic focus integrating the teaching in English and Spanish. *Defts' Uncontested ¶65; Ex. 12 (Transition Committee Report, Chapter 1, General Information, 1.2 Programmatic Commitments, stating that the Central Government established public policy, including 24 commitments related to the Department of Education); see Commitment DS45, p. 1-22, establishing that "In order to strengthen even more the teaching of Science and Mathematics special projects were developed in joint action with governmental and private agencies and entities. Among those, the project "Puerto Rico Statewide Initiative to Achieve Excellence on Math and Science (PR-SSI)" excels.*

Plaintiffs object to above defendants' statement as to the allegation therein that the contents of said statement are "Certain of the goals of the Department of Education for the year 2000". The document referred to by defendants is summarizing what has already been established at the Department of Education. It is not something new established by the new P.D.P. administration. Even the "Commitment DS45" is entitled "Will be continued the strengthening of the ....."). In addition, said statement is denied since the document referred to, Transition Committee Report, is inadmissible. According to the document, it is not

known who prepared the same nor for what purpose; the same is not signed, and does not

even have the logo of the Department of Education. In addition, the contents of the

document is not final.  It clearly states in the lower part that the document is a "Draft for

discussion only".  *Plaintiffs' Uncontested ¶66.*

66. The duties of the position consisted of the following:

**a**. Directing, planning, coordinating and serving as a liaison, and facilitating effective communication between the Department of Education and the Science and Engineering Resources Center by taking the necessary administrative steps for the effective development of the program within the Department of Education, including the allocation of matching funds appointments and assignments of teachers within the department who worked at the PR-SSI, authorizations for teachers to participate in activities, allocation of resources to schools, as well as other actions related to the optimal development of the PR-SSI Program.

**b.** Keeping the Deputy Secretary for Teaching the Director of Academic Services, the Director of Administrative Services, the Director of Teaching Support Services, the Directors of the Science, Mathematic, English and Spanish Programs and the Assistant Secretary for Planning and Development, and other programs pertinent to PR-SSI, informed of the development of the program, and contributed to the harmonization of PR-SSI with the policies of the department, particularly regarding curricular standards and the development of frameworks, guidelines, and circular letters of the curriculum, and processed all the correspondence needed for the development of the program, in the short and long term.

**c.** Facilitated communication between the directors of the Science, Mathematics, English and Spanish programs in the Department of Education so as to foster coordination and meaningful connections among the curricula of these subjects and to ensure that the directors were familiar with all PR-SSI activities and participated in them.

**d.** Collaborated in the planning and implementation of key PR-SSI programs and activities, particularly those involving participation of the department.

**e.** Making sure that the necessary information from the department was available, document the project and comply with the report requirements requested by the National Science Foundation (NSF) and other entities contracted by them in order to monitor the program,

including Westat Mckenzie, and to collaborate with the Evaluation and
Assessment Component of PR-SSI in the evaluation of the program.
**f.** Represent the deputy secretary at different activities, meetings, and
other events when requested.
**g.** Collaborating and participating in the implementation of the public
policy of the education system. (Ex. 15, Certification of Duties of
Position Executive III (Director of the Puerto Rico Statewide Systemic
Initiative Program (PR-SSI), signed by Evelyn Vicente, Director,
Classification and Compensation Division on June 4, 2002.).

*Defts' Uncontested ¶66.*

Plaintiffs deny above defendants' statement.  Said unsworn statement, not a formal

or official job description, is a self serving inaccurate hearsay certification prepared on June

4, 2002, not in the normal course of business- just like three other certifications produced

in the same date for the other plaintiffs in the present case- but for a specific purpose,

defending Rey, related to the filing of the complaint on March 7, 2001.

In relation to the functions indicated in said certification, the same are objected,

especially the last one, where it is indicated that plaintiff Rivera "collaborated and

participated in the implementation of the public policy of the public education system" (the

same phrasing utilized in the three other certifications for the other plaintiffs in the present

case). Said self serving personal opinion of Vicente, alleged director of Classification and

Compensation Division, is not made in the regular course of business but to be used for a

specific purpose in relation to the complaint filed in the present case.  The self serving

personal opinion of Vicente, goes against the sworn evidence in the present case, including

the following:

The P.R.S.S.I. was an alliance with the Resource Center for Services and Emergencies

of the University of Puerto Rico with co-sponsoring of the Natural Science Foundation. The

Department provided economic support but the project was presented by the Resources Center of the U.P.R. *Plaintiffs' Exhibit III, Carmen Rivera's depo., p. 14, lines 21-25; p. 15, lines 4-8, 15-19.* Plaintiff Rivera was the link between the Department of Education and the University. She represented the Department in the activities the Resource Center celebrated. *Plaintiffs' Exhibit III, p. 16, lines 10-25.*

As liaison between the Department of Education and the University, plaintiff Rivera had to maintain the communication between the project of Puerto Rico SSI and the Department of Education. Plaintiff Rivera answered to Luz Ivette Cruz Rodriguez, the Director of Academic Services. Everything plaintiff did in the P.R. SSI was organized by the project. Plaintiff did a monthly report of the work done and handed it to the Director of Academic Services. Her duties were already established in the proposal which came from the U.P.R. Plaintiff was never called Director, but the liaison of P.R.S.S.I. *Plaintiffs' Exhibit III, pp. 18-19, p. 30; Defendants' Exhibit 16, p. 16.* Said proposal, which started in the year 1992, was for ten years, ending in the year 2002. *Plaintiffs' Exhibit III, pp. 15-16.*

The U.P.R. had the leading part in the project, was the leader, but the Department put the most money and plaintiff Rivera was the link between the two entities. *Plaintiffs' Exhibit III, p. 20, lines 5-17.* The purpose of the project was to give the schools dominion to make their own proposals, seeking with the constructive view that students change their method of learning. *Id.,p. 21, lines 11-15, 24-25; p. 22, lines 1-4.* For that purpose, the students in the project were not going to work with the regular textbooks that the students of schools usually worked with, they had some curricular units. *Defendants' Exhibit 16, p. 21.*

Plaintiff Rivera did not have any discretion between the programming or functions of the program and she received instructions from her immediate supervisor. *Plaintiffs' Exhibit III, p. 31, lines 12-23.*

According to Pillich, Auxiliary Secretary of Human Resources under Rey, in plaintiffs' cases the necessity of political affiliation to the P.D.P. to occupy trust positions was not determinative; plaintiffs' position of trust did not have any powers, only functions. *Plaintiffs' Exhibit X, p. 52, lines 6-10; p. 67, lines 14-25; p. 68, lines 1-5.* Pillich could not say if plaintiffs in their trust positions formulated public policy, nor did she know if plaintiffs in their trust positions had confidential information. *Id., p. 70, lines 2-8; p. 71, lines 24-25; p. 72, lines 1-3.*

According to Hilda Cortés Figueroa, Director of the Faculty Personnel Division, Human Resources, political affiliation was not necessary for plaintiffs to occupy their trust positions. *Plaintiffs' Exhibit XI, p. 20, lines 24-25; p. 21, lines 1-3.* As a result, in the present case exists an essential and substantial controversy of fact related to the actual functions that plaintiffs performed. *Plaintiffs' Uncontested ¶66.*

67. Rivera describes the trust position as being one of liaison in the alliance between the Department of Education and the University of Puerto Rico, Center of Resources for Teaching Science and Engineering, with the co-sponsor of the National Science Foundation. *Defts' Uncontested ¶67; Ex. 16 at 14-16.*

Plaintiffs accept above statement.

68. The Department of Education was the largest financial contributor to the PR-SSI and had to have someone supervising that financial contribution. Rivera was the person

responsible for making sure the budget was approved. *Defts' Uncontested ¶68; Exhibit 16 at 15, 20, 30.*

Plaintiffs accept part of the defendants' statement.  It is accepted that the Department of Education was the largest financial contributor to the P.R.S.S.I. The rest of the statement is denied. According to plaintiff's deposition cited by defendants, the Department had a person, in this case plaintiff Rivera, who served as liaison and who could see how the project was working out, since the Department sponsored it financially, but basically, the SSI was the U.P.R. *Defendants' Exhibit 16, p. 20.*

The U.P.R. would organize all the activities and the U.P.R. would monthly inform plaintiff of the activities related to the project planned for the month, which were workshops for teachers, visiting schools, establishing centers for the dissemination of the project- because not all schools were in the project and the U.P.R. wanted to include all the schools- preparation of curricular materials, curricular units. *See Plaintiffs' Exhibit III, p. 18.*

For these curricular units – which were sort of a notebook– they (the U.P.R.) wrote a budget that had to be prepared every year. Every year a budget had to be calculated for said curricular units, notebooks, within the budget of the Department, which was the one who paid for said curricular units. *Defendants' Exhibit 16, p. 30.* However, nowhere on said page of said deposition is indicated that plaintiff was responsible for making sure that the budget, which was for said notebooks, was approved.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 48

Plaintiff would then go to the printing press to follow up on the preparation of the notebooks, what status it had, for when; she was the one who moved within the Department for those things. *Defendants' Exhibit 16, p. 30*; *Plaintiffs' Uncontested ¶68.*

69. Rivera was the sole representative of the Department of Education at all activities organized by the Center of Resources related to this project.  She attended activities organized by the U.P.R. as guest representing the Department of Education. Although Rivera claims that her participation was limited, she recognizes that in situations where someone asked what the position of the Department of Education was, she would respond if possible, and if not she would ask her supervisor, Luz Ivette Cruz, the Undersecretary for Academic Services, and Dr. Isidra Alvino, the special co-investigator from the Department of Education, and then the Secretary, if necessary, for a response to the inquiry in order to properly respond. *Defts' Uncontested ¶69; Exhibit 16  at pp. 16; 20-21, 25.*

The statement is denied. Plaintiffs clarified in relation to questions asked to her related to the position of the Department.  According to plaintiff's deposition, she did not go to all the activities of the P.R.S.S.I. She never participated actively in the activities, except when she was asked a question, --what does the department think about this or something-- , and she did not know, she always had to come to Luz Ivette Cruz, who was the Director of Academic Services, and she, in turn, to Dr. Alvino, and Dr. Alvino to the Secretary. See *Defendants' Exhibit 16, p. 25*. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶69.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 49

70. One goal of the project was to empower the schools, following the constructivist approach to help students change their way of thinking. *Defts' Uncontested ¶70; Ex. 16 at 22*.

Plaintiffs deny above statement. The purpose of the project was to empower schools so they would themselves make their proposals; empower the schools was that the U.P.R. held meetings with the directors of the schools.  It was voluntary; the schools had to choose whether to belong to the project.  The U.P.R. presented to the directors the advantages of the project, where they were not going to work with the regular textbooks that the students of schools usually worked with, they had some curricular units. The objective that was pursued was, with that thing about the constructionist approach, for students to change their way of learning. Some materials were adapted, and it was the same curriculum, but it was an initiative, something different of how to carry out this project, to improve the quality of the students. And it worked in the manner that the U.P.R. chose the schools, a dissemination center was opened in each school district, and there was a teacher in post who was the coordinator, with duties as a coordinator to counsel the school's faculty. Those teachers did not report to plaintiff; she had nothing to do with it.  Everything was the U.P.R. *Defendants' Exhibit 16, pp. 21-22; Plaintiffs' Uncontested ¶70*.

71. Her main role as liaison was to maintain communication. *Defts' Uncontested ¶71; Exhibit 16 at 18*.

Plaintiffs accept above statement.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 50

72. On January 16, 2001, Rivera was reinstated to a career position as Elementary School Teacher ("R53658) earning a monthly salary of $2,295.00. *Defts' Uncontested ¶72; Exhibit 16 at 12; Ex. 2C.*

Plaintiffs deny defendants' statement above in relation to plaintiff's new salary in the career position. The indicated salary for the new positions, in accordance to the January 12, 2001 communication informing her of the ceasing of the trust appointment, is $1,920.00. The handwritten marks on the document, which have not been identified or justified, are objected. On January 12, 2001, Rivera was removed by Rey from her trust position and was reinstated to the position of teacher, receiving at that moment a salary of $1,920.00. As Executive III she earned a salary of $2,959.00.  *Plaintiffs' Exhibit III, p. 81, lines 10-14; Plaintiffs' Exhibits XVI and XXIV.*

73. Rivera admits that she performed all the duties as teacher, her career positions after reinstatement.  *Exhibit III,. at p. 82.*  Her allegations of being stripped of duties were based on the fact that she no longer performs the duties of liaison, the trust position. *Defts' Uncontested ¶73; Ex. 16 at 99 -100.*

74. She claims that she experienced certain problems with the environment at her new school and a certain degree of what she perceived was hostility from her new coworkers but admits that otherwise her working conditions were normal. *Defts' Uncontested ¶74; Ex. 16 at 82-83.*

75. On May 31, 2001, Rivera retired effective July 27, 2001, with a monthly salary of $2,295.00. *Ex. 2C.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 51

76. Rivera does not know Rey. *Defts' Uncontested ¶76; Ex. 16 at 32.*

Plaintiffs accept above defendants' statements ¶¶73-76.

77. Rivera assumes that Rey knows her political affiliation through third party's disclosures. *Defts' Uncontested ¶77; Ex. 16 at 44-47.*

Plaintiffs deny above defendants' statement. Defendant Rey is the one, through his communication of January 12, 2001, addressed to and received by plaintiff Rivera, who removed plaintiff from her trust position and transferred her to a career position. The trust employees in the Department when the P.D.P. administration started were all affiliated to the N.P.P.  *Plaintiffs' Exhibit III, p. 39, lines 19-25.*

Mrs. María Moran, Technician of the Science Course at the Department, now Director of the Science Program, and a fellow worker named Teresa Vega tried to help Rivera to remain in her trust position, but they were told that all trust employees who were N.P.P. were going to be removed. *Plaintiffs' Exhibit III, p. 39, lines 3-25.*

Plaintiff Rivera always identified herself in the Department as a N.P.P. sympathizer. *Plaintiffs' Exhibit III, p. 41, lines 19-25.*

When Rey was about to start as Secretary, Rivera wrote him a letter telling him that she was a trust employee, that she had remained in her position of trust, and would like to remain there, since she was taking an early retirement, and she would be in the position for only six months until the date of retirement. *Id., p. 33, lines 9-25; p. 34, lines 1-21.*

Teresa Vega, a week before the removal of Rivera from her trust position, told her to be calm, that she had interceded in her favor so she could remain in the trust position, with the Sub-secretary of Education. However, later on she told her she could not help her

because trust employees were going to be removed. Trust employees Rivera knows were all N.P.P. followers. *Id., p. 89, lines 13-25; p. 90, lines 3-6, 14-25.*

Rivera does not know of any trust employee who was removed who was not an N.P.P. follower. Everyone who occupied a trust position was blacklisted because N.P.P. followers were going to be removed. *Id., p. 91, lines 1-4, 22-25.* Rivera was substituted in her position by Jorge Vázquez, who was a P.D.P sympathizer. *Plaintiffs' Exhibit VII, page 24, lines 1-14. Plaintiffs' Uncontested ¶77.*

78. Rivera assumes that Rey knows her political affiliation because she sent Rey a letter when he became Secretary of Education informing that: she held a trust position and it was at his disposition; she had made an irrevocable decision two years earlier to retire from the Department of Education, even before knowing whether the N.P.P. would win or lose the elections; and her retirement would be effective July 2001. *Defts' Uncontested ¶78; Ex. 16 at pp. 33-34.*

Plaintiffs deny above defendants' statement. According to plaintiff Rivera, Rey knows her. *Defendants' Exhibit 16, p. 33.* When Rey was about to start as Secretary, Rivera wrote him a letter telling him that she was a trust employee, that she had remained in her position of trust and would like to remain there since she was taking an early retirement, and she would be in the position for only six months until the date of retirement. *Plaintiffs' Exhibit III, p. 33, lines 9-25; p. 34, lines 1-21.* In addition, defendant Rey is the one, through his communication of January 12, 2001, addressed to and received by plaintiff Rivera, who

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 53

removed plaintiff from her trust position and transferred her to a career position. The trust employees in the Department when the P.D.P administration started were all affiliated to the N.P.P. *Id., p. 39, lines 19-25; Plaintiffs' Uncontested ¶78.*

79. Rivera does not consider herself a political activist; she only votes. *Defts' Uncontested ¶79; Ex. 16 at pp. 32-33.*

Plaintiffs accept above defendants' statement and qualifies same in that she always identified herself in the Department of Education as a N.P.P. sympathizer. *Plaintiffs' Exhibit III, p. 41, lines 19-25; Plaintiffs' Uncontested ¶79.*

80. Rivera complained that she had been stripped of her duties, but recognized that she meant that she had been stripped of her duties from the trust position, and admits that she was able to perform all the duties of a teacher, and that other than some perceived hostility from other teachers, her working conditions were normal, and the Director of the School treated her very well. *Defts' Uncontested ¶80; Ex. 16 at pp. 57, 82, 83, 99, 100.*

Plaintiffs accept above statement, with the qualification that as a result of her removal from her trust position, Rivera's coworkers started to make fun of her and started to doubt her prior good reputation as a teacher. *Plaintiffs' Exhibit III, pp. 85-86.* Also, as a direct result of her removal from her trust position, plaintiff Rivera developed a major depressive disorder and panic disorder, needing psychiatric treatment. *Plaintiffs' Exhibit XXII; Plaintiffs' Uncontested ¶80.*

81. Rivera retired from the Department of Education effective July 27, 2001 with a monthly salary of $2,295.00. *Defts' Uncontested ¶81;Ex. 2C.*

Plaintiffs accept above defendants' statement.

## AS TO PLAINTIFF COSS MARTINEZ:

82. Plaintiff María M. Coss Martínez was appointed to the trust position of Director of the Physical Education Program on January 11, 2000 (Position Executive III, #R00044) earning a monthly salary of $2,556.00. *Defts' Uncontested ¶82; Ex. 18 at 13; Ex. 2D.*

Plaintiffs deny the salary indicated by defendants. According to Exhibit 2D, plaintiff Coss received a monthly salary of $2,959.00 in her trust position. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶82.*

83. The position of Director of the Physical Education Program was one of trust which involved the implementation of public policy regarding the physical education program for the entire Commonwealth of Puerto Rico. *Defts' Uncontested ¶83; Ex. 18 at 14 and 18.*

Plaintiffs deny the part that the position involved the implementation of public policy is denied; this asseveration does not appear in the pages of the deposition cited, it is a personal opinion of attorney for defendant. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶83.*

84. Coss obtained the position after interviewing with the former Secretary of Education, Víctor Fajardo, and Dra. Alvino, Deputy Secretary for Instruction, whom she had met through political activities. *Defts' Uncontested ¶84; Ex. 18, at 12, 94.*

Plaintiffs deny part of defendants' statement above. It is denied the part where it is stated that plaintiff Coss met Secretary of Education Fajardo and Dra. Alvino, Deputy Secretary for Instruction, through political activities. According to the page of the deposition cited by defendants, plaintiff knows Fajardo as the Secretary of Education and

Dra. Alvino since she has been in the Department of Education. Plaintiff Coss has met Fajardo at political activities and would socialize with him at said activities, but her appointment as Director was not owed to her political affiliation. Coss had the capacity to perform the job as Director and all evaluations indicated she was professionally capacitated to perform the functions of Director. *Plaintiffs' Exhibit IV, p. 91, lines 12-17*. The rest of the statement is accepted. *Plaintiffs' Uncontested ¶84.*

85. The position was responsible for supervising the island-wide program of sporting activities according to the work plan of the Secretary of Education, and implementing the Secretary's work plan. *Defts' Uncontested ¶85; Ex. 18 at 12-15; 16; 18.*

Plaintiffs deny in part above defendants' statement. The part that the position of director held by plaintiff Coss was responsible for supervising the program of sporting activities is denied. According to the deposition cited, the state Physical Education Program that plaintiff directed carried out the sporting activities according to the work plan of the Secretary of Education. Plaintiff answered to Dr. Luz Ivette Cruz, the Deputy Secretary for Academic Services. Dr. Cruz in coordination with Dra. Alvino, to whom Dr. Cruz answered, and then Dr. Alvino with the Secretary of Education, would give approval to carry out the Department of Education activities. The sporting activities are first organized at the districts, where the teachers would organize the interscholastic activities; then the districts, in coordination, would organize regional activities and the state-wide activities at the Department level. All the activities were carried out within the Secretary's work plan; the work program came from the Secretary's office. *Plaintiffs' Uncontested ¶85.*

86. The 2,132 teachers from the 100 school districts would organize games in various disciplines such as volleyball, baseball, softball, basketball, track and field, as well as other less widely participated in sports, such as chess, judo, or karate and tennis; the winners of said games would then participate in tournament games held at the regional level where 10 teams would compete (1 from each region) and finally at the island-wide level; and the tournament would be divided between three levels of elementary, middle school and high school.  The Director of the Physical Education Program would coordinate between the levels. *Defts' Uncontested ¶86; Ex. 18 at 17, 20, 21, 22, 25, 29.*

Plaintiffs accept above statement, with the qualification that after the districts would organize, the itinerary would be sent to plaintiff and then plaintiff would sent it to Dr. Cruz, and then Dr. Cruz would send it to Dr. Alvino, who would then sent it to the Secretary of Education, who would make the decision as to whether those activities could be carried out within the dates that were set or not; the Secretary would decide the how, when and where. *See defendants' Exhibit 18, p. 26, lines 3-10; Plaintiffs' Uncontested ¶86.*

87. The Secretary's work plan specified that certain sporting activities would have to be held; and they would meet as a group in regards to the work plan. *Defts' Uncontested ¶87; Ex. 18 at pp. 25-26.*

Plaintiffs accept above defendants' statement, with the qualification that plaintiff would meet as a group with the districts in relation to the activities and itinerary, and then plaintiff would send this information up the chain of command. *See the pages of the deposition cited by defendants; Plaintiffs' Uncontested ¶87.*

88. When Coss arrived at the position, the work plan for that year was already established, and she only participated in the implementation of the work plan. *Defts' Uncontested ¶88; Ex. 18 at 32.*

Plaintiffs deny above statement. The allegation that "When Coss arrived at the position, the work plan was already established" is denied. Nowhere on page 32 of the deposition cited by defendants is that asseveration contained. What is clear from that page of the deposition is that plaintiff Coss, in relation to compiling and formulating the work plan, did not have active participation in the work plan. She could not suggest things to be added to the plan nor change or modify the plan. She would simply be given the plan already done and she would implement it, nothing else; she had no authority to suggest modifications of any kind. *Plaintiffs' Uncontested ¶88.*

89. The Organic Law of the Department of Education specifies the obligation that schools have to provide physical education to its students: "Schools shall provide all their students, a minimum of three (3) hours a week of physical education. One physical education teacher is guaranteed for every school. For schools with more than two hundred and fifty (250) students, additional teachers shall be designated for each two hundred and fifty (250) students or a fraction thereof." 3 L.P.R.A. § 144c-1. *Defts' Uncontested ¶89; Ex. 6B, p. 6.*

90. Furthermore, the Organic Law, when defining the duties of the Secretary of the Department of Education, specifies: "The Secretary, as academic director of the Puerto Rico Public Education System, shall: ... Establish a basic curriculum for the Public Education System that is flexible enough for the schools to adapt it to their needs. It shall include

physical education courses as a curriculum requirement." 3 L.P.R.A. § 145t (c). *Defts'*

*Uncontested ¶90; Ex. 6B, p.13.*

91. The Organic Law further requires that the Secretary "(w) Develop a two (2)-year

plan, assigning the necessary funds, to establish physical education courses in all the

schools of the System." 3 L.P.R.A. § 145t(w). *Defts' Uncontested ¶91; Ex. 6B, p. 13.*

Plaintiffs accept above defendants' statements ¶¶89-91.

92. The inherent duties of the position of Director of the Physical Education Program

consisted of the following:

> **a.** Directing, planning, coordinating, organizing and supervising the
> technical and administrative work of the Physical Education Program.
> **b.** Attending meetings, conferences, and activities in her own capacity
> and on her supervisor's behalf.
> **c.** Studying and analyzing program-related laws and regulations in order
> to recommend the necessary changes and adjustments.
> **d.** Drafting correspondence and preparing reports requested of her.
> **e.** Providing technical assistance to school directors and teachers on all
> matters related to the regulations of the Physical Education Program.
> **f.** Organizing and participating in sports activities at the schools.
> **g.** Offering advice and talks about sport services and educational and
> training purposes.
> **h.** Answering phone calls and providing the information requested.
> **I.** Collaborating and participating in the implementation of the public
> policy of the public education system. (Ex. 17, Certification of Duties
> of Position Executive III (Program Director in the Physical Education
> Program, signed by Evelyn Vicente, Director, Classification and
> Compensation Division on June 4, 2002.)

*Defts' Uncontested ¶92.*

Plaintiffs deny defendants' statement above. Said unsworn statement by defendants,

is not a formal or official job description, but a self serving inaccurate hearsay certification

prepared on June 4, 2002, not in the normal course of business- just like three other

certifications produced in the same date as to the remaining plaintiffs in the instant case-but rather is one prepared for a specific purpose, to defend co-defendant Rey in relation to the filing of the complaint on March 7, 2001. As to the functions indicated in said defendants' certification, the same are objected, especially the last one, where, totally incorrect, it is indicated that plaintiff Coss "collaborated and participated in the implementation of the public policy of the public education system" (the same phrasing utilized in the three other certifications for the other plaintiffs in the present case). Said self serving personal opinion of Vicente, alleged director of Classification and Compensation Division, is not made in the regular course of business but to be used for a specific purpose in relation to the complaint filed in the present case.  The self serving personal opinion of Vicente, goes against the sworn evidence in the present case, including the following:

The physical education program for the whole island handled the sport activities planned according to the work plan of the Secretary of Education. *Plaintiffs' Exhibit IV, p. 14, line 6-9.* Plaintiff Coss in her trust position responded to the Sub-secretary of Academic Services, who in turn responded to the Sub-secretary of the Faculty, who in turn responded to the Secretary of Education. *Plaintiffs' Exhibit IV, p. 15, lines 7-21.*

According to Pillich, Auxiliary Secretary of Human Resources under Rey, in plaintiffs' cases, the necessity of political affiliation to the P.D.P. to occupy trust positions was not determinative; plaintiffs' positions of trust did not have any powers, only functions. *Plaintiff's Exhibit X, p. 52, lines 6-10; p. 67, lines 14-25; p. 68, lines 1-5.* Pillich could not say if plaintiffs in their trust positions formulated public policy nor did she know if plaintiffs

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 60

in their trust positions held confidential information. *Plaintiffs' Exhibit X, p. 70, lines 2-8; p. 71, lines 24-25; p. 72, lines 1-3.*

According to Hilda Cortes Figueroa, Director of the Faculty Personnel Division, Human Resources, political affiliation was not necessary for plaintiffs to occupy their trust positions. *Plaintiffs' Exhibit XI, p. 20, lines 24-25; p. 21, lines 1-3.*

The Director of the program before Coss was designated, Mr. Efrain Otero, had occupied said position for twenty (20) years. *Plaintiffs' Exhibit IV, p. 91, lines 17-20.*

As a result, in the present case there exists an essential and substantial controversy of fact related to the actual functions that plaintiff performed. *Plaintiffs' Uncontested ¶92.*

93. Coss was reinstated to the career position of Teacher of Physical Education (#R40048) with a monthly salary of $2,005.00. *Defts' Uncontested ¶93;Ex. 2D.*

94. Plaintiff Coss was reinstated to the position of Teacher of Physical Education. *Defts' Uncontested ¶94; Ex. 18 at 32.*

Plaintiffs accept above defendants' statements ¶¶ 93-94.

95. Plaintiff asserts that she encountered the following problems after her reinstatement that: she was assigned to teach young children though she had previously been teaching older children, yet she never complained or asked to be reassigned, and now admits that she would stay there; she nor the other physical education teacher had an assigned classroom; and  some other teachers made some comments; but other than that, she was able to work as a physical education teacher. *Defts' Uncontested ¶95; Ex. 18 at pp. 79, 82, 87-88.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 61

Plaintiffs deny above statement.  Plaintiff Coss never complained about the school she was reinstated to, nor asked to be reassigned, and now admits she would stay there. In the pages of the deposition cited by defendants said allegations do not appear. She was placed at an elementary level, while she used to teach at higher level. At the intermediate and high school levels the physical education teachers, in the great majority, had a classroom. Now, in this assigned school there was no classroom for the physical education teachers. *See defendants' Exhibit 18, pp. 79, 82*. When Coss was removed from her position as Director, she was assigned a position of physical education teacher of first to third graders, although Coss had spent many years as a physical education teacher in the intermediate and superior levels. *Plaintiffs' Exhibit IV, p. 77, lines 9-25*. When Coss assumed the position of physical education teacher, after her removal from her trust position, the teachers who worked with her kept referring to her as the director who was thrown out of the Department, creating a very humiliating situation for plaintiff. *Plaintiffs' Exhibit IV, p. 113, lines 2-19*. As a direct result of her removal from her trust position, plaintiff Coss developed a major depressive disorder with psychotic features, needing psychiatric treatment. *Plaintiffs' Exhibit XXIII.  Plaintiffs' Uncontested ¶95*.

96. She asserts that she was stripped of functions, but that they were the functions of the trust position. *Defts' Uncontested ¶96; Ex. 18 at 91*.

Plaintiffs accept above statement.

97. Coss does not know Rey, but assumes Rey knows her political affiliation through third party disclosures. *Defts' Uncontested ¶97; Ex. 18 at 32, 41*.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 62

Plaintiffs deny defendants' statement above.  Defendant Rey is the one, through his communication of January 12, 2001, addressed to and received by plaintiff, who removed plaintiff from her trust position and transferred her to a career position. The trust employees in the Department when the P.D.P. administration started were all affiliated to the N.P.P.  *Plaintiffs' Exhibit III, p. 39, lines 19-25*. Everybody at the Department of Education, the personnel who works at the Academic Services, knew Coss' political affiliation. *Plaintiffs' Exhibit IV, p. 41, lines 8-18*. Plaintiff Coss is affiliated to the N.P.P., she is politically active, has been a college official, participates in all political activities, walks, and meetings. *Id., p. 42, lines 7-20*.

On January 8, 2001, when Rey started at the Department of Education, he solicited from an employee by the name Cheryl Nuñez to look in Coss' file for her social security number. *Id., p. 44, lines 8-17*.  When Rey arrived at the Department, Teresa Vega, Cheryl Nuñez, a P.D.P. sympathizer, and other persons identified with the P.D.P. determined who were the persons who belonged to the N.P.P. *Id., p. 56, lines 7-14*. The person who substituted Coss as Director, Mr. Jorge Colón, is a sympathizer of the P.D.P.  *Plaintiffs' Exhibit IV, p. 61, lines 2-14*.

98. On July 1, 2005, she presented her resignation for retirement, effective July 28, 2005, with a monthly salary of $2,505.00. *Defts' Uncontested ¶98; Ex. 4*.

99.  None of the plaintiffs went to the Board of Appeals of the Educational System 3 L.P.R.A. §145q §§ 274 *et seq.* of Title 18.  *Defendants' Uncontested ¶99*.

Plaintiffs accept above defendants' statement ¶¶98-99.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 63

## LEGAL DISCUSSION

### A. Plaintiffs' *Prima Facie* Case.

A plaintiff who claims he/she was a victim of political discrimination "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus. It is the plaintiff who bears the initial burden of showing that political discrimination was the motivating factor in the adverse decision." *See* Avilés-Martínez v. Monroig, 963 F.2d 2 (1st Cir. 1992); Mt. Healthy City School District Board v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568 (1977). Only after plaintiffs have established their *prima facie* case, the burden shifts to defendants who must establish that they would have taken the same action regardless of plaintiffs' political beliefs. *Id*. *See also* Sánchez López v. Fuentes Pujols, 375 F.3d 121 (1st Cir. 2004).[6]

Plaintiffs who claim being a victim of political discrimination "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus. It is plaintiffs who bear the initial burden of showing that political discrimination was the motivating factor in the adverse decision." *See* Avilés-Martínez v. Monroig, 963 F.2d at 5; Mt. Healthy City School District Board v. Doyle, 429 U.S. at 287, 97 S.Ct. 568.

To prevail in a § 1983 claim, grounded on a First Amendment constitutional violation, plaintiffs have to demonstrate defendants deprived them of their federal constitutional rights, privileges or immunities, while acting under color of state law.

---

[6] Even if plaintiff can demonstrate political affiliation as a substantial factor in the adverse employment action, there is no violation of First Amendment if defendant can show it would have taken the same action in any event and it would have taken that action for reasons that are not unconstitutional. Sanchez López v. Fuentes Pujols, 365 F.3d at 131.

Romero-Barceló v. Hernández-Agosto, 75 F.3d 23, 32(1st Cir. 1996). In order to establish a *prima facie* case of political discrimination pursuant to § 1983, plaintiffs have to establish they engaged in a constitutionally protected conduct and this conduct was the motivating factor in the adverse action. *Id*. See González-De-Blasini v. Family Department, 377 F.3d 81, 85 (1st Cir. 2004); Mt. Healthy City Sch. Dist. Bd. v. Doyle, 429 U.S. at 287, 97 S.Ct. 568. Further, plaintiffs must demonstrate a causal relation between defendant's conduct and plaintiffs' political beliefs. LaRou v. Ridlon, 98 F.3d 659, 663(1st Cir. 1996). That is, "[t]he plaintiff must point 'to evidence on the record which, if credited, would permit a rational finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus." González-De-Blasini v. Family Department 377 F.3d at 85 quoting LaRou v. Ridlon, 98 F.3d at 661 (quoting Rivera-Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994)). Although circumstantial evidence may be sufficient to support a finding of political discrimination, plaintiffs must make a fact specific showing that a causal connection exists between the adverse treatment and their political affiliation. Aviles-Martinez v. Monroig, 963 F.2d at 5 . *See* Cruz-Baez v. Negrón-Irizarry, 360 F.Supp.2d 326, 338-339 (D. Puerto Rico 2005 ).

A *prima facie* case of political discrimination in violation of First Amendment requires, as above established, that the public employee and the defendant belong to opposing political affiliation, the defendant had knowledge of the employee's affiliation, a challenged employment action occurred and political affiliation was a substantial or motivating factor behind the adverse employment action. Martínez-Vélez v. Rey-Hernández, 506 F.3d 32 (1st Cir. 2007).

<u>Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.</u>
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 65

The record now before this Court, still adduces the same position held by defendants before the Court of Appeals insofar as a *prima facie* case of political discrimination in violation of plaintiffs' First Amendment. Plaintiffs had provided evidence to support their contentions against defendants' averments in that plaintiffs were all sympathizers of the N.P.P. party and holders of trust positions at the time the new elected government of the opposing P.D.P. party took office. Shortly thereafter, without having examined plaintiffs' duties nor the extent of their performance, all the N.P.P. sympathizers were separated from their trust positions, placed in their former career positions, and substituted in the trust positions by P.D.P. sympathizers.

A defendant in a political discrimination case may contest plaintiffs' prima facie evidence of a First Amendment violation, offering a Mt. Healthy defense in that the adverse employment action would have been taken anyway for permissible reasons.

Defendants have now submitted a description of duties which was not available at the time of the initial appeal indicating in a general way the policy-making status for each of the plaintiffs. Still, plaintiffs have submitted a controversy of facts, not only by denying the duties presented by defendants, but also by shedding doubt as to how and when were these depictions of plaintiffs' alleged duties now before this Court prepared. The itemized duties were not prepared in the normal course of business and were not on the record by the time defendants took the determination to remove plaintiffs from their trust positions. The evidence is still at this summary judgment level and it is uncontested that no reference was made by the head of the agency insofar as plaintiffs' duties or performances when making the decision to relieve them from the trust positions. Thus, plaintiffs have raised

a genuine controversy of facts that the duties presented by defendants are not reliable as to the personnel decision undertaken against them back in the January of 2001, but were rather prepared in June of 2002 for the purpose of defending the lawsuit filed by plaintiffs.

**B.  Political Affiliation as Requirement of Position**.

In addition to the controversy of facts as to the plaintiffs' duties and performance, there is also evidence on record, through plaintiffs' opposition, that political affiliation was not considered necessary for the performance of their respective positions. Both Pillich, Auxiliary Secretary of Human Resources, and Cortés, Director Faculty Personnel Division Human Resources, indicated political affiliation was not a requirement for the positions held by plaintiffs. *Plaintiffs' Exhibits X, XI.*

Among defendants grounds to seek summary disposition of plaintiffs' claims is an attempt to establish that there was a great number of trust positions at the Department of Education by the time the new political government took office after the general elections. Many of these trust employees had already requested their reinstatement to career positions and had in fact been reinstated.  Defendants submit that upon arrival in January of 2001 of defendant Rey, as Secretary of Education, he requested an inventory of trust positions to reduce their numbers and to reorganize the Department. It is claimed, with the plaintiffs' objection to the document submitted in support, the positions were evaluated based on need and necessity. *Defts' Exhibit 19, pp. 20-22, 23-24, 25.*

Plaintiffs object as to the above since the record and defendants' own deposition testimonies, as well as the former opinion on appeal in this case, indicate that at the time of the personnel decision to remove plaintiffs from their trust positions, co-defendant Rey

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 67

did not know of the inherent powers nor duties of each of these plaintiffs, much less could

he have determined at the time these plaintiffs participated in the formulation of public

policies. Such lack of knowledge as to the powers and extent of plaintiffs' positions of trust,

which defendants have also acknowledged not necessarily require political affiliation, were

not reasons back in January of 2001 to support the decision to remove plaintiffs and

reinstate them to their former career positions. The Department of Education personnel

in charge of making the list of trust positions, Pillich, requested by defendant Rey also

stated in the sworn deposition testimony not knowing what plaintiffs' duties were and if

they held confidential information. *Plaintiffs' Exhibit IX, pp. 55-63; Exhibit IX, p. 54;*

*Exhibit X, p. 26, 41, 52, 57.*[7]

Pursuant to above contested issues regarding the plaintiffs' trust positions, it is

argued their removal from trust positions cannot be sustained within the rationale of Elrod

V. Burns, 427 U.S. 347, 355-73, 96 S.Ct. 2673, 2680-89 (1976) and Branti v. Finkel, 445 U.S.

507, 513-20, 100 S.Ct. 1287 (1980). Elrod and Branti and its progeny have developed a

useful framework for assessing the constitutionality of patronage dismissals, but courts

have generally proceeded on a case-by-case basis to enumerate the permissible and

impermissible instances of politically motivated employment decisions since identifying

generic categories of positions where partisan selection and rejection are permissible has

---

[7] The record also shows that Pillich, then Auxiliary Secretary of Human Resources, and who advised defendant Rey on personnel issues, saw for the first time plaintiffs' personnel files in the year 2002. She had no opportunity to evaluate plaintiffs' performance, duties or scope of their employment before preparing and submitting a list of trust positions that are now claimed political affiliation is determinative.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 68

proven to be an elusive and intractable task. *See* Jiménez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241 (1st Cir.1986).

Succinctly, defendants' arguments are on one hand there was no political discrimination since the trust positions were eliminated as part of a reorganization at the Department of Education. Still, there was formerly evidence, and is part of the defendants' deposition testimonies that at the time these plaintiffs were removed from their trust positions, there was no examination of their duties, their need for services, nor their individual performance. In addition, plaintiffs additionally presented evidence they were replaced in their positions by individuals who were affiliated or sympathizers of their opposing political party, the P.D.P., for which the claim of reorganization and reduction of trust positions in the Department of Education have come in controversy. To contest defendants' claim of reorganization, plaintiffs' evidence submits that all trust employees removed were N.P.P. followers and all those appointed to substitute them were P.D.P. followers or sympathizers.

Co-defendant Rey submits the supervisors who were provided with plaintiffs' names and positions considered these were not individuals of their trust and, as such, he relied on their decision not to incorporate plaintiffs to these supervisors' area or field of supervision. Still, the justification for lack of trust does not disregard the same was on account of the plaintiffs' political affiliation. Without more, and in the absence of an assessment of plaintiffs' duties, performance or job evaluations, which were at the time unavailable to either defendants herein or to their supposedly potential supervisors. Thus, even if those supervisors who allegedly indicated to co-defendant Rey that plaintiffs lacked their trust

and would not be considered to remain in their trust positions, a politically discriminatory animus has not been disregarded. Plaintiffs have objected and/or denied defendants' statements of facts on relevant and pertinent issues. Plaintiffs have denied defendants' submission of the jobs duties for each of their trust position. Defendants have represented as having political and public policy components as a requirement of these trust positions. Even more, co-defendant Rey's averment that trust positions did not require political loyalty to any party but a commitment to work , together with the job duties not being a formal personnel established guideline, raise a controversy of facts regarding the removal of all trust positions who happened to have been N.P.P. affiliates and their replacement by opposing party sympathizers, those of the newly elected P.D.P. administration.

Contrary to Méndez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1260 (1st Cir. 1987), wherein the Court of Appeals for the First Circuit stated that "[w]henever possible, we will rely upon [the written job description] because it contains precisely the information we need concerning the position's inherent powers and responsibilities ....", the written job description submitted by herein defendants as to plaintiffs' alleged duties were opposed by plaintiffs. These documents were not part of the official personnel records of plaintiffs at the Department of Education but prepared afterwards, in the year 2002, once this federal complaint for political discrimination had been filed. The statement of duties does not appear as a regular business record nor was attested by a sworn statement by an officer at the Human Resources at the Department of Education. Neither are these certifications qualified as to the duties inherent to the positions plaintiffs held at the time or the time period the duties encompassed.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 70

Thus, in view of the foregoing, there are genuine controversy of material facts which preclude the entry of summary judgment as requested by defendants.

## C.  Qualified Immunity as to co-defendant Rey.

Utilizing Uncontested Statements ¶¶ 100-117, co-defendant Rey has requested qualified immunity be determined since, at the time of taking the personnel action as to these plaintiffs who were holding trust positions, no reasonable individual would have considered that by reinstating them to the former career positions he would have incurred in any constitutional violation.  If so, it would have followed defendant be entitled to qualified immunity[8] because his "actions could reasonably have been thought consistent with the rights alleged to have violated".  *See* Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).[9]

In summary, defendant Rey submits the Department of Education had before January 2001, a significant number of trust employees who had already requested reinstatement to career positions when Rey began as Secretary.[10]  Upon his arrival, an inventory of trust positions was requested to determine its numbers and to reprogram or

---

[8] "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

[9] The analysis of qualified immunity is two-folded; if the constitutional rights were violated and if so, whether those rights were clearly established so that an officer could reasonably have thought his conduct was consistent with those rights.

[10] Law No. 85 of May 24, 2000, required all transitory employees who occupied a position of fixed term with permanent functions of the career service as of June 30, 2000, to become a regular career employee in a position equal or similar to the one previously occupied as transitory.  As a result, between May and September of 2000, approximately 6,000 employees became regular, career positions at the Department of Education. *Deft's Uncontested ¶¶106-107; Exhibit 21-A.*

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 71

reorganize them. *Defts' Uncontested ¶¶100-102.* Statistics of the total number of trust

positions between September 30, 2002 and March 31, 2001, found a decrease of 158 from

234. *Defts' Exhibit 21 A-E.*

Co-defendant Rey submitted the new organization at the Department of Education

he created, which from the approximately list of 40 individuals who had not been reinstated

from their trust to a career position. The inventory of trust positions included the instant

four plaintiffs. Rey states he does not consider political affiliation essential to hold a trust

position, but the individuals most hold his trust. Had the supervisors who were submitted

plaintiffs' names determined to leave plaintiffs in their trust positions, Rey would have

taken the determination to leave them in their trust positions. Still, since these four

individuals did not have the trust of their potential supervisors, they did not have either the

trust of the Secretary and Rey relied upon the decisions of under-secretaries and regional

directors on the matter. *Defts' Uncontested ¶¶114-117; Exhibit 19 at 34-35, 73, 74; Exhibit

20 at, 45-46, 48, 71-72.*[11]

Plaintiffs object defendants' uncontested facts as to the reasons for taking the

personnel action against plaintiffs. As to the statistics of the number of employees and the

chart submitted thereto by defendants of the Department of Education, these are

considered misleading. Regardless of the claims of an inventory of trust positions, those

therein included had all been named by the former N.P.P. administration and there is no

---

[11] Although there is no supervisory liability, and it requires a demanding standard, an officer can still be held liable under Section 1983 for the acts of their subordinates if they engaged in supervisory encouragement, condonation, or acquiescence, or gross negligence amounting to deliberate indifference. Lipsett v. Univ. of Puerto Rico, 864 F.3d 881, 902 (1st Cir. 1988).

known trust employee who was removed under such alleged grounds who was not an N.P.P. sympathizer.  The statistics as to transitory employees becoming regular career positions presented by defendants do not entail trust employees and, thus, is not relevant.  Additionally, the deposition testimonies had also made clear that co-defendant Rey had no opinion, since he lacked any information, as to these plaintiffs' satisfactory performance in their trust positions.  Neither had he previously examined their personnel files and, thus, had no knowledge of what each of the plaintiffs did at the time he determined they should be removed from the trust positions and reinstated to a career positions.  Furthermore, Rey could not have any knowledge at the time of taking the personnel action of removing them from the trust positions on whether these plaintiffs were or not engaged in making public policy since the undisputed evidence presented for summary judgment and, prior to that before the Court of Appeals, was that Rey did not even know what were the plaintiffs' responsibilities in the positions of trust or what were their functions or their inherent powers at the time.  *Plaintiffs' Uncontested ¶105-107 a-k.*   Additionally, Pillich, who provided co-defendant Rey with the inventory list of trust positions which included these four plaintiffs around January of 2001, was also neither in a position to advise then Secretary of Education Rey, on the above void since she did not examine the personnel files.  It was not until the year 2002 that these files were examined. *Plaintiffs' Uncontested ¶108-a-m; Exhibit X, Exhibit XI.*

The letters of removal from trust positions were notified to plaintiffs on January 12, 2001, once co-defendant Rey became Secretary of Education around January 8, 2001. The information as to these individuals holding trust positions could have revealed at the most

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 73

who occupied the position when the new administration took office, the title of the trust position, and the position the employee had held previously at a career status. There was no knowledge by co-defendant Rey as to whether any of these plaintiffs, who were removed from trust positions, in fact carried out public policy. Furthermore, both co-defendant Rey and Pillich had indicated political affiliation was not determinative to carry out and occupy trust positions. *Plaintiffs' Uncontested ¶115, Exhibit X, Exhibit IX*.

Adverse employment decisions include transfers, promotions, recall or hiring decisions and freedom of belief and association of public employees are precisely the core of activities protected by the First Amendment. Elrod v. Burns, 427 U.S. 347, 356, 96 s.Ct. 2673 (1976) (public employees who were discharged for their failure to support a political party clearly infringes First Amendment freedom of belief and of association).

Plaintiffs have disputed the salary amounts they previously received in their trust positions, and attested to receipt of lower salary at the positions where they were reinstated. Besides the reduction of duties, plaintiffs have submitted being affected by detrimental office environment, lack of office facilities, deterioration of their health conditions, among others, as well as the psychological effects of what they considered discriminatory employment actions. There is sufficient evidence showing the change in positions resulted in a significant change to plaintiffs' work conditions encompassed within their *prima facie* burden.

Since co-defendant Rey had no job descriptions nor knowledge of plaintiffs' duties at the time of removal from their trust position from where he could have then determined public policy concerns were at issue, he cannot support now a subjective belief under

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 74

summary judgment standards that plaintiffs could be removed regardless of political affiliation. Inquiries required as derived from <u>Branti</u>, involve whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interest or concerns. If the first inquiry is satisfied, next it must be examined the particular responsibilities of the position to determine if it resembles a policymaking, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is required. <u>Jiménez Fuentes v. Torres Gaztambide</u>, 807 F.2d at 242.

As such, co-defendant Rey's contention for entitlement to qualified immunity because political allegiance and partisan loyalty were required as basis for the removal from the trust positions, without considering same a violation of constitutional rights, is unsupported by the evidence. Even if proposed, qualified immunity in this factual scenario would still result in genuine issues of material fact in controversy. The duties of the position, management level, among others, are prongs which need to be examined in order to determine the trust or confidential nature of a government position. None of which steps appear *prima facie* to have been taken by co-defendant Rey in regard to herein plaintiffs. *See* <u>Id</u>, 807 F.2d at 236; *see also* <u>Galloza v. Foy</u>, 389 F.3d 26, 28-29 (1ˢᵗ Cir. 2004) (government employee cannot discharge or demote employee merely because they are not sponsored by or affiliated to a particular political party, except when political affiliation is an appropriate requirement for the effective performance of the public office).

As such, government employees who do not occupy policy-making position of confidence or trust are protected from adverse employment decisions based on political

affiliation.  Public employees not holding policy-making positions are protected from adverse employment actions based on political affiliation, and such has been the established policy since Branti, 445 U.S. at 517-19 and Rutan v. Republican Party of Illinois, 497 U.S. 62, 75, 110 S.Ct. 2729 (1990).  Branti departed from the confidential and policymaking labels stated in Elrod since these labels were under-inclusive since a position may be appropriately considered political even though it is neither confidential nor policy making in character.

The current standard for when an official is acting within the limits of qualified immunity focuses on the objective reasonableness of the official's conduct.  It is one not measured against the official's actual knowledge of constitutional standards and the probable constitutionality of his action, but rather against a relatively uniform level of "presumptive knowledge" of constitutional standards.  Emery v. Holmes, 824 F.2d 143 (1st Cir. 1987); Floyd v. Farrell, 765 F.2d 1, 4-5 (1st Cir. 1985).

In the absence of any steps to engage in an examination and analysis regarding of the policy-making components of plaintiffs' trust position, and there being by the time co-defendant Rey took the adverse employment decision sufficient case law which would have required a more reasonable examination so that thereafter defendant could find no constitutional violation in support for the decision to remove plaintiffs from their trust positions and reinstate them to their prior regular positions, qualified immunity is not considered appropriate at this juncture.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 76

## D. Due Process Claim.

Finally, defendants submit plaintiffs have no due process right for their removal from a trust position and for being reinstated to their previous career position. A reduced salary and diminished responsibilities are not considered to shock the conscience to require a substantive due process. Maymí v. Puerto Rico Ports Authority, 515 F.3d 20 (1st Cir. 2008).

Additionally, when a person possesses a property interest in continued public employment, they cannot be deprived of said interest without due process. Kercado-Meléndez v. Aponte Roque, 829 F.2d 255, 263 (1st Cir. 1987).

However, the Constitution does not create property rights, but these may flow from an independent source such as state law. The laws of Puerto Rico grant property interest in employment to career employees not to trust ones. Kauffman v. Puerto Rico Tel. Co., 841 F.2d 1169, 1173 (1st Cir. 1988). As such, by 2000 the Court of Appeals for the First Circuit had already stated in Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1 (1st Cir. 2000) that those persons who possess property interest in continued employment could not be deprived of same without due process which at a minimum provided notice and a meaningful opportunity to respond. Since on one hand, Puerto Rico law distinguishes between career employees and trust employees wherein career employees are permanent and may only be removed for just cause after due filing of charges. On the other hand, trust

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 77

employees are of free selection and removal, that is, removable with or without cause, still

not because of discrimination unless political partisan is a requirement of the position, due

process does not cover trust employees.[12]

Hence, plaintiffs' positions as trust employees provided no protected property

interest for which no due process becomes due prior to removing them from a trust position

and reinstating them to a regular position.   Thus, herein defendants are entitled to

summary judgment as to plaintiffs' cause of action regarding due process violations for not

being granted a prior pre-determination proceeding prior to removing plaintiffs from their

trust positions.

## CONCLUSION

In view of the above discussed, it is recommended that defendants' Motion for

Summary Judgment be **GRANTED IN PART AND DENIED IN PART** as follows:

Defendants' request for summary judgment as to plaintiffs' lack of *prima facie* case,

a changeover defense and for qualified immunity be **DENIED** in light of the existence of

genuine issues of material fact in controversy and there being credibility determinations

which need to be assessed by the trier of facts.

Defendants' request for summary judgment as to plaintiffs' cause of action regarding

due process violations be **GRANTED**.

---

[12] Government employee who does not occupy a policymaking position of confidence and trust is protected, under the First Amendment, from adverse employment decisions based on employee's political affiliation. Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 23, n. 2 (1st Cir. 2006); Figueroa-Serrano v. Ramos-Alverio, 221 F.3d at 3 n. 1 (1st Cir. 2000); 21 P.R. Laws Ann. §4554(b); 3 P.R. Laws Ann. §1350.

Ivonne Monfort Rodríguez et al., v. César Rey Hernández, et al.
Civil No. 01-1276 (JAG)
Report and Recommendation
Page No. 78

IT IS SO RECOMMENDED.

The parties have ten (10) working days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).  *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

IT IS SO ORDERED.

San Juan, Puerto Rico, this 30[st] day of October of 2008.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE